**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CEI ENTERPRISES, INC. a/k/a CORNWELL ENTERPRISES, INC., PATRICIA D. CORNWELL, and STACI GRUBER, PhD, ) ) ) ) ) | |
| Plaintiffs, ) ) | Civil Action No. _____ |
| v. ) ) | |
| ANCHIN, BLOCK & ANCHIN LLP, ) ) | |
| Defendant. ) ) | |

**Jury Trial Demanded on All Counts so Triable.**

This is an action in which CEI Enterprises, Inc. a/k/a Cornwell Enterprises, Inc. ("CEI"), its sole shareholder Patricia D. Cornwell ("Ms. Cornwell"), and her spouse Staci Gruber, PhD ("Dr. Gruber") (collectively "Plaintiffs") seek an accounting and damages from their former accounting firm and business manager Anchin, Block & Anchin LLP for negligent performance of professional services, breach of fiduciary duty, and violation of the Massachusetts and New York consumer Protection Acts.

**Jurisdiction and Venue**

1. Plaintiff CEI is a corporation incorporated in Virginia with its principal place of business in Massachusetts.

2. Plaintiff Ms. Cornwell is an author whose principal residence and offices are located in eastern Massachusetts.  Ms. Cornwell is the sole owner of CEI.

3. Plaintiff Dr. Gruber, Ms. Cornwell's spouse, is a Harvard neuroscientist whose principal residence and place of business are located in eastern Massachusetts.

4. Defendant Anchin, Block & Anchin LLP ("Anchin") is a limited liability partnership that provides accounting and traditional and non-traditional advisory services to privately held corporations and high net worth individuals. Anchin's principal place of business is in New York City.

5. Although Anchin does not maintain an office in Massachusetts, from January 1, 2005 (and earlier through predecessor entity Yohalem Gillman & Co.) through August of 2009, Anchin transacted business with Plaintiffs in the Commonwealth, contracted to supply services to Plaintiffs in the Commonwealth, caused tortious injury to Plaintiffs by an act or omission in the Commonwealth, and caused tortious injury to Plaintiffs by an act or omission outside of the Commonwealth while regularly doing business in the Commonwealth and deriving substantial revenue from services rendered in the Commonwealth. This Court therefore has personal jurisdiction over Defendant pursuant to Massachusetts General Laws, c. 223A, § 3.

6. The citizenship of Defendant on the one hand, and Plaintiffs on the other, is diverse; and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court therefore has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.

7. Venue is proper in this district because Plaintiffs Ms. Cornwell and Dr. Gruber maintain their principal residence and workplaces and Plaintiff CEI maintains its principal offices in eastern Massachusetts, and the real property referenced herein is located in Massachusetts.

**Preliminary Factual Allegations Applicable to All Counts**

8. Beginning in the late 1990's, Plaintiffs CEI and Ms. Cornwell retained the services of Stanley Gillman, a principal in a New York Certified Public Accounting ("CPA") firm known as Yohalem Gillman & Company ("Yohalem Gillman") for investment management. CEI's and Ms. Cornwell's business needs were otherwise handled through CEI's own employees. On April 5, 2002, following a lengthy illness, Mr. Gillman passed away. Thereafter, Yohalem Gillman principal Ira Yohalem ("Mr. Yohalem") informed Plaintiffs CEI and Ms. Cornwell that he would take over responsibility for their accounts.

9. In the second half of 2004, Yohalem Gillman began transitioning toward a merger into regional CPA and advisory firm Anchin, which merger was to take effect on January 1, 2005. Unlike Yohalem Gillman, which was a CPA firm that also offered some other financial services, Anchin holds itself out as a "full-service firm ...[that] serves privately-held businesses and high net worth individuals with a wide range of traditional and non-traditional advisory services, including financial statement preparation; tax planning ...; management and succession advisory services; litigation support; forensic accounting and valuation services; and wealth management." Anchin offers its clients concierge style full-service management services. In the words of Anchin principal Evan Snapper ("Mr. Snapper") to Ms. Cornwell, Anchin would "do everything for its clients including buying and delivering their toilet paper."

10. In the second half of 2004 as the merger was approaching, Yohalem Gillman assumed an increasing role in CEI's business activities. Ms. Cornwell was, and remains, unaware of the full extent to which Yohalem Gillman involved itself in aspects of CEI's

business other than accounting and investments, in the period immediately preceding the merger.  However, she is aware that Mr. Snapper encouraged her to terminate CEI's staff, worked with her in accomplishing that termination of CEI's staff as of early January, 2005, and encouraged her to transition all of CEI's and her business needs to Anchin immediately following Yohalem Gillman's merger with the latter.

11.   Ms. Cornwell is a best-selling crime novelist whose ability to write is dependent upon the ability to avoid distractions.  A quiet, uninterrupted environment, free of the distractions of managing her business and her assets, was essential to her ability to write and to meet her deadlines.  Further, Ms. Cornwell openly acknowledges her diagnosis with a mood disorder known as bi-polar disorder, which, although controlled without medication, has contributed to her belief that it is prudent for her to employ others to manage her business affairs.

12.   Over the course of the several months following the January 1, 2005 merger, the tasks undertaken by Anchin grew in scope until Anchin became Ms. Cornwell's and CEI's full service concierge business manager.  Anchin assumed full accounting responsibilities, full investment responsibilities, and undertook all other aspects of CEI's and Ms. Cornwell's business affairs.  Of particular import with regard to business affairs, Anchin, particularly through Mr. Snapper, assumed responsibility for CEI's and Ms. Cornwell's real estate, including the acquisition, divestiture, and leasing of real estate. Anchin also assumed responsibility for other major acquisitions, including automobiles and other modes of transport.

13. By 2006, Anchin held full powers of attorney for CEI, Ms. Cornwell, and even Ms. Cornwell's mother.  Examples of the functions undertaken by Anchin increasingly over time included, but were not limited to, the following:

(a) All incoming revenues to CEI and Ms. Cornwell, including especially those attributable to Ms. Cornwell's books, were sent by her current agent ICM and her former agent Donald Congdon directly to Anchin.  All investment income was also sent directly to Anchin.  Anchin opened multiple bank accounts (as many as eleven at one time), determined into what bank accounts the revenues would be placed, and moved money around among the accounts at its sole discretion.  Principals of Anchin were the sole authorized signatories on such accounts until 2009.

(b) Anchin paid all of CEI's and Cornwell's bills from the latter's accounts, via self-executed internal transfers, without approval or review by CEI or Ms. Cornwell.

(c) Anchin handled all investments, directly or those from brokers of Anchin's own choosing, for CEI, Ms. Cornwell, and Dr. Gruber.  Anchin selected all such investments without input from Ms. Cornwell, CEI, or Dr. Gruber until Ms. Cornwell, upon finally learning of the extent of the investment losses, insisted that the investments be transferred to bonds.  Early in the investment management relationship with Yohalem Gilman, Stanley Gillman discussed with Ms. Cornwell the wisdom of CEI and Ms. Cornwell investing conservatively, with which Ms. Cornwell agreed.  Apart from this conversation, no one from Yohalem Gillman or Anchin ever discussed with Ms. Cornwell or Dr. Gruber their risk tolerance and investment objectives, and Ms. Cornwell never revoked personally or for CEI the directive that their funds be invested conservatively.

(d) Anchin determined where Ms. Cornwell's and CEI's automobiles, Ms. Cornwell's and Dr. Gruber's motorcycles, and helicopters maintained for CEI's business purposes would be registered.

(e) Anchin performed, or at least purportedly performed, the due diligence on all leases of real property for CEI and Ms. Cornwell, and performed, or purportedly performed, the due diligence for the acquisition, renovation, and sale of all real property for CEI and Ms. Cornwell.

(f) Anchin prepared all tax returns for Ms. Cornwell and CEI and, at least in the year 2007, signed and filed the CEI return without review or signature by Ms. Cornwell.

14. Anchin held the sole signatory rights on all of CEI's and Ms. Cornwell's bank accounts and did not provide bank statements to Ms. Cornwell; nor did it provide Ms. Cornwell with passwords that would have allowed her to access the bank accounts on line.

15. Anchin did not, at least with any regularity, provide statements of investment balances to Ms. Cornwell, CEI, or Dr. Gruber, nor did Ms. Cornwell, CEI, or Dr. Gruber know with any specificity how their funds were invested.

16. Anchin did not generally share with Ms. Cornwell or CEI where it chose to register automobiles, motorcycles, or the helicopter used by CEI for business purposes, nor did Anchin provide the rationale for the selection of such registration sites.

17. Anchin did not generally share with Ms. Cornwell or CEI contract documents, including insurance policies, leases, consulting and vending contracts, or the results of due diligence efforts with regard to real property that CEI, Ms. Cornwell, or their affiliates were renting or acquiring.

18. Anchin did not provide monthly or periodic balance sheets to CEI or Ms. Cornwell, or any other documentation from which the latter could track revenues and expenses.

19. Anchin did not regularly provide CEI or Ms. Cornwell with financial statements, or any other documentation from which the latter could determine their net worth.

20. In July of 2009, after four and a half years in which Anchin controlled Ms. Cornwell's and CEI's business affairs and investments, including all check writing purportedly on behalf of Ms. Cornwell and CEI, Ms. Cornwell demanded information as to her net worth, and that of CEI. Notwithstanding eight figure earnings per year during that period, CEI and Ms. Cornwell learned that their net worth, while substantial, was the equivalent of only approximately one year's net income. They also learned that Anchin had borrowed on their behalf collectively several million dollars, comprised of mortgages for real property and a loan for the purchase of a helicopter.

22. Ms. Cornwell terminated the relationship with Anchin effective August 31, 2009, except for the requirement that Anchin complete the 2008 income tax returns, then on extension, for her individually and for CEI. She required that all records be delivered to her forthwith.

## Count I: For an Accounting

23. Plaintiffs incorporate paragraphs 1 through 22 as if set forth here in their entirety.

24. Defendant Anchin received all revenues and controlled the payment of all expenses for Ms. Cornwell and CEI for a period of approximately four and a half years, from the beginning of 2005 until mid-2009.

25. For the majority of the relevant period, Anchin agreed to charge CEI and Ms. Cornwell on an hourly basis, but Anchin paid itself internally and an accounting for such hours was not generally provided to CEI or Ms Cornwell.

26. In or about mid-July, 2007, Ms. Cornwell complained to Anchin that she did not believe that Anchin was treating CEI and her fairly with regard to amounts that Anchin was unilaterally collecting from them.  She demanded financial statements and explanations for amounts that Anchin had collected, but such documentation was not forthcoming.  By the end of 2007, Anchin had paid itself almost $1,000,000 from Ms. Cornwell and CEI, all without providing bills, or billing detail or back-up.

27. Commencing in or about May of 2008, Ms. Cornwell insisted that Anchin charge her and CEI cumulatively no more than $40,000 per month.  Notwithstanding that this agreement was reached, Anchin paid itself a supplemental $45,000 on September 30, 2008, without notice to CEI or Ms. Cornwell, and without so much as an internal invoice to explain this charge.  When Ms. Cornwell and CEI announced to Anchin that they were terminating the latter's services, Anchin contended that Ms. Cornwell's and Anchin's previous monthly payments had merely been "retainers," and that they actually owed several hundred thousand additional dollars for which she had not yet been billed.

28. Once files were turned over by Anchin at the conclusion of the relationship in 2009, Ms. Cornwell and CEI identified numerous checks or documents that they do not

understand and for which they require an explanation. Examples include, but are not limited to, the following:

(a) electronic checks for cash that Ms. Cornwell and CEI do not believe that they authorized or approved, e.g., an electronic "check" for the purported "gift" of $11,000 to a business associate who denies ever receiving the funds (which she would have returned);

(b) an electronic check for cash in the amount of $5000, with a memo line indicating that it was a gift from Ms. Cornwell to Mr. Snapper's daughter (whom Ms. Cornwell has never met) on the occasion of the daughter's bat mitzvah;

(c) three $500,000 checks for the deposit on a property in Eastern Massachusetts, with only one indicated as being voided, even though only one check was necessary for that deposit;

(e) two $50,000 deposits to the DeNiro Group (on information and belief, another Anchin client), both voided, apparently for a sub-tenancy on which a final $40,000 deposit was paid directly to the tenant, with regard to an apartment that Ms. Cornwell occupied only briefly for several reasons, including a misrepresentation to the Board that Ms. Cornwell was a "cousin" of the tenant;

(f) numerous checks or transfers to Power Motorcars (on information and belief, another Anchin client or friend of Mr. Snapper's) including several that appear to relate to vehicles that CEI and Ms. Cornwell did not purchase from Power Motorcars;

(g) numerous reimbursements of Anchin employee expenses, including substantial expenses for travel and entertainment particularly by Mr. Snapper, that were not authorized by Ms. Cornwell, and for which minimal (or no) back-up is provided

(h)   a non-holiday season check to cash for $5000 purportedly for $100 bills for "PC" that she does not recall requesting or receiving;

(i)   a partially executed lease for a property in Miami, Florida, without other documentation, for an apartment never occupied by CEI or Ms. Cornwell;

(j)   a deposit check for a property that failed inspection and was not purchased (with no accompanying documentation as to whether the deposit was refunded);

(k)   records of rental payments paid for an apartment that was vacated by CEI and Ms. Cornwell when it became uninhabitable because of flooding from elsewhere in the building;

(l)   tax schedules including, or checks reflecting, charitable deductions that Ms. Cornwell did not recall making or authorizing.

28.  Because statements regarding CEI's, Ms. Cornwell's, and Dr. Gruber's investments were generally not provided to CEI, Ms. Cornwell, or Dr. Gruber, they cannot determine before 2009 how their funds were invested or what the gains/losses were on their investments.

29.  From the time that Anchin assumed responsibility for CEI's and Ms. Cornwell's business in January of 2009 until the present, they have not, to their knowledge, engaged in any major cash outlays that would explain why Ms. Cornwell's net worth at the time that she terminated Anchin's service was less than $10,000,000, despite high eight figure total earnings during that period.

30.  From the time that Anchin assumed investment management for Dr. Gruber's funds at the urging of Mr. Snapper, Dr. Gruber has lost a significant percentage of her investments.  In mid-2009, Dr. Gruber also learned that Anchin has caused the books and

records of CEI to reflect that she owes CEI in excess of $100,000 for a loan that she never authorized, with regard to an indebtedness that she was never aware she had incurred.

      WHEREFORE, Plaintiffs pray for a full and accurate accounting of all revenues received, expenses incurred, investments made, and other transactions and events that have affected their respective net worth.

### Count II:  Negligent Performance of Professional Services

      31.  Plaintiffs incorporate paragraphs 1 through 30 as if set forth here in their entirety.

      32.  CEI and Ms. Cornwell retained Anchin after January 1, 2005 to provide full service concierge business management, including accounting and investment services. Dr. Gruber retained Anchin at some point thereafter to provide accounting and investment management services.

      33.  Anchin deviated from accepted standards of care for an average reasonably qualified and prudent full-service business manager in its handling of CEI's and Ms. Cornwell's business as alleged above, and in numerous other ways including without limitation:

      (a)  Anchin paid itself each month, in varying amounts until the last few months of the relationship, without providing CEI or Ms. Cornwell with an invoice, and generally without informing them that the payments had been made.  Indeed, even internal invoices were only occasionally prepared, and no time records or other back-up documentation were every provided.

(b)  Anchin agreed to oversee, directly or through a consultant whom Anchin retained, the renovation of a large residence/personal office located on Garfield Road in Concord, Massachusetts.  The property was intended to be CEI's principal office and Ms. Cornwell's and Dr. Gruber's principal residence.  Unfortunately, Anchin provided no meaningful oversight, although it did retain, at CEI's expense, an individual from New York to fill the oversight role.  That individual was rarely present, and the mismanaged renovations resulted in such significant damage to the structure, e.g., removal of one or more bearing walls, and failure to make the building water-tight, that the building was rendered uninhabitable in its existing state.

(c)  While the above referenced renovations were in progress, Mr. Snapper performed a review of the contractor's insurance to confirm that it was adequate to protect CEI as beneficial owner of the property, and Ms. Cornwell as the sole owner of CEI.  Although he purchased additional personal injury insurance on behalf of the contractor at CEI's expense, he neither assured that professional services (i.e., malpractice) insurance was procured by the contractor, nor caused it to be purchased on behalf of the contractor.  As a result, CEI and Ms. Cornwell suffered millions of dollars in unrecoverable worthless renovation costs, as well as a multi-million dollar reduction in the fair market value of the property.  With a basis of approximately $8,000,000 (although the full renovation expenditures are yet to be confirmed), the 355 Garfield Road Realty Trust of which Mr. Snapper was the sole Trustee and CEI the sole beneficiary sold the property for only $3,000,000 in the summer of 2009.

(d)  At some point beginning no later than 2006, Anchin began to list its own Manhattan address as the address of CEI, although CEI was a Virginia corporation with

its principal place of business in Massachusetts. This practice on Anchin's part included registering vehicles owned by CEI at Anchin's address, although the vehicles were not garaged there, and, with the exception of one local car maintained at the Trump Tower, were not garaged in New York at all. Anchin then caused the helicopter to be purchased in CEI's name. The combination of purchasing the helicopter in CEI's name, coupled with the misuse of Anchin's address as CEI's address, caused, or significantly contributed to causing, New York State to audit CEI with regard to whether a New York State sales tax would be required on CEI's purchase of the helicopter, even though the helicopter was purchased in Tennessee, and garaged in Massachusetts where CEI maintained its principal place of business. The audit resulted in CEI being compelled to pay a compromise settlement of $187,656.36 in sales tax and interest, and to incur substantial legal fees and related costs, none of which would likely have been incurred if Anchin had refrained from using an incorrect address in New York for CEI, and purchasing the helicopter in CEI's name.

(e)  Anchin's practice of listing Anchin's address as CEI's and Ms. Cornwell's address in virtually all settings caused, or significantly contributed to causing, New York State audits of Ms. Cornwell that resulted in inappropriately high allocations of her income to New York. Indeed, Anchin, through Mr. Snapper, entered into agreements premised on an inaccurately high allocation of her time and revenue to New York, all without input from or notice to CEI and Ms. Cornwell.

(f)  Anchin assumed responsibility for locating rental apartments to be used by Ms. Cornwell when visiting New York, particularly for business reasons. Anchin, acting through Mr. Snapper, failed to exercise reasonable judgment and perform appropriate

diligence before committing CEI and/or Ms. Cornwell to binding leases, and failed to protect CEI's and Ms. Cornwell's interests when problems arose. These deviations from accepted standards of care for a business manager included, without necessary limitation:

(i) entering into a lease at One Central Park West, without determining that construction was about to commence on the two units immediately above the rented apartment, thereby rendering the apartment uninhabitable due to noise and construction dust for a period of more than a year, during all of which time Ms. Cornwell continued to pay the full rent on the uninhabitable unit;

(ii) entering into a lease at 135 Central Park West and paying all or most of the several month balance of the lease term, even after the property flooded and was rendered uninhabitable;

(iii) entering into a sublease on Fifth Avenue under circumstances where Ms. Cornwell and Dr. Gruber were told by Anchin after Anchin entered into the lease that they would have to pose as the cousins of the tenant, who was Middle Eastern, even though Ms. Cornwell and Dr. Gruber are both fair in complexion and hair and eye color, and do not even remotely appear to be Middle Eastern;

(iv) causing, or substantially contributing to causing, Ms. Cornwell to miss one book deadline entirely, such that one year's income for the Scarpetta series was lost, because the real estate difficulties described herein presented Ms. Cornwell with too many distractions to permit meeting her deadline.

34. Anchin deviated from accepted standards of care for a qualified, reasonably prudent investment manager in its handling of CEI's, Ms. Cornwell's, and Dr. Gruber's investments. Such deviations included, without limitation:

   a. failing to abide by the conservative investment objectives and low risk tolerance that Ms. Cornwell expressed at the outset for herself and CEI to Stanley Gillman;

   b. failing either to abide by the conservative investment objectives and low risk tolerance that Ms. Cornwell expressed at the outset for herself and CEI to Stanley Gillman, or to determine whether Ms. Cornwell's and CEI's investment objectives and low risk tolerance had changed at any time after Mr. Gillman passed away;

   c. failing to determine Dr. Gruber's investment objectives and risk tolerance, which were respectively relatively conservative and relatively low;

   d. failing to keep Ms. Cornwell, CEI, and Dr. Gruber regularly apprised of the nature of their respective investments, or the gains/losses associated therewith;

   e. making high risk investments, including at Lehman Brothers, without the approval of CEI, Ms. Cornwell, or Dr. Gruber, notwithstanding that such investments were neither prudent nor consistent with the clients' investment objectives and risk tolerance; and

   f. failing to alert Ms. Cornwell, CEI, and Dr. Gruber to the significant decline in their investments, until their losses exceeded those in the market generally.

   35. On information and belief, Anchin deviated from accepted standards of care for a qualified, reasonably prudent accounting firm in performing accounting services for Ms. Cornwell, CEI, and Dr. Gruber. On information and belief, such deviations included, without limitation:

   a. filing returns in such a fashion that various audits, particularly by the State of New York, have been triggered;

  b.  failing, at least in a timely fashion, to treat international taxes in the permissible fashion to achieve maximum credits for CEI;

  c.  failing to have returns ready by filing deadlines, thereby necessitating extensions, or missing deadlines, and depriving the taxpayers of adequate opportunity to review and correct the returns; and

  d.  on at one occasion, filing and signing a tax return under a power of attorney without allowing the taxpayer the opportunity to review or correct the return.

  36.  The deviations from accepted standards of professional care, including those itemized above have caused significant damage to Ms. Cornwell, CEI, and Dr. Gruber.

### Count III: Breach of Fiduciary Duty

  37.  Plaintiffs incorporate paragraphs 1 through 36 as if set forth here in their entirety.

  38.  Anchin owed multiple fiduciary duties to Ms. Cornwell, CEI, and Dr. Gruber, including as full-service business manager, accountants, and investment managers.  In addition, Anchin owed a fiduciary duty to Ms. Cornwell and CEI because Anchin partners Evan Snapper, Ira Yohalem, and perhaps others, acted as trustees and officers of various affiliated entities in whose names assets were acquired and held. Further, Anchin and its partners owed a fiduciary duty to Ms. Cornwell and CEI because they held full powers of attorney to handle all of Ms. Cornwell's and CEI's business affairs, and many of their personal affairs.

  39.  Anchin's conduct, as alleged above, failed to meet the high standards of loyalty and care owed in a fiduciary relationship and therefore gave rise to breaches of various fiduciary duties to CEI and Ms. Cornwell as a business manager, as accountants,

and as an investment manager, and to Dr. Gruber as accountants and investment managers.

40. In addition to the conduct alleged above, Anchin also engaged in the practice of regularly referring CEI and Ms. Cornwell to, or entering into transactions on behalf of CEI and Ms. Cornwell with, other Anchin clients for products and services, e.g., the purchase of vehicles, and the rental of properties. On information and belief, in such conflict of interest situations, CEI and Ms. Cornwell were often treated less favorably than would have been the case if they were dealing with unrelated parties. Such conduct also constituted a breach of fiduciary duty.

41. Ms. Cornwell, CEI, and Dr. Gruber have all suffered damages as a result of Anchin's breaches of its various fiduciary duties.

### Count IV:   Violation of M.G.L. c. 93A

42. Plaintiffs incorporate paragraphs 1 through 41 as if set forth here in their entirety.

43. Anchin is a legal "person" that engages in trade or commerce. CEI and Ms. Cornwell are also persons who engage in trade or commerce.

44. Anchin's conduct as alleged above constituted unfair or deceptive acts or practices within the meaning of M.G.L. c. 93A, § 2 in the conduct of Anchin's trade or commerce as a business manager, accounting firm, and investment manager.

45. Anchin's use or employment of the unfair or deceptive acts or practices was a willful or knowing violation of Massachusetts General Laws, c. 93A, § 2.

46. Ms. Cornwell and CEI suffered monetary damages as a result of Anchin's use or employment of unfair or deceptive acts or practices declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two.

### Count V:  Violation of the New York Consumer Protection Act

47. Plaintiffs incorporate paragraphs 1 through 46 as if set forth here in their entirety.

48. Anchin's conduct as described above occurred in New York as well as in Massachusetts, although the injury to Plaintiffs occurred in Massachusetts where they reside and have their principal places of business.  Therefore, the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349 (McKinney 2004) is also applicable.

49. Anchin acts as a business manager, accountant, and investment manager for privately held companies like CEI and for high net worth individuals like Ms. Cornwell and Dr. Gruber.  Anchin's acts or practices as described above are consumer-oriented and have an impact on consumers at large falling into the categories of privately held corporations and high net worth individuals.

50. Anchin's conduct as alleged above was deceptive or misleading in a material way, in that Plaintiffs were, *inter alia*, unaware of the full fees being charged, unaware that their investment objectives and risk tolerance were not being honored, unaware until recent months how their money was being invested and how their investments were performing, unaware that various vehicles and CEI's helicopter were being registered in New York with resulting tax disadvantages, unaware that various gifts may have been made in their names without "credit" to or acknowledgement of them, unaware that their

real estate project was not being properly managed, and unaware of the lack of due diligence undertaken with regard to their rental properties.

49. CEI, Ms. Cornwell, and Dr. Gruber were all injured and suffered actual monetary harm by reason of Anchin's deceptive or misleading conduct, such harm including without necessary limitation loss of investments, loss in income, reduction in net worth, additional taxes and interest, and loss of money in the form of fees and expenses inappropriately charged.

**WHEREFORE,** Plaintiffs pray:

1. for a full accounting;

2. for the right to amend their Complaint as appropriate upon receipt of the full accounting;

3. for damages as determined by the jury awardable to each Plaintiff;

4. for punitive damages as appropriate under M.G.L. c. 93A;

5. for an award of their reasonable attorneys' fees and costs under M.G.L. c. 93A;

6. for punitive damages as appropriate under the New York Consumer Protection Act;

7. for an award of their reasonable attorneys' fees and costs under the New York Consumer Protection Act;

8. for interest and costs as allowed by law;

9. for such other and further relief as this Court deems appropriate.

Respectfully submitted,

CEI ENTERPRISES, INC.
PATRICIA D. CORNWELL
STACI GRUBER, Ph.D.

By their attorneys,

/s/ Joan A. Lukey_____
Joan A. Lukey (BBO # 307340)
Dan Krockmalnic (BBO # 668054)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7171
joan.lukey@ropesgray.com
Dated: October 13, 2009        dan.krockmalnic@ropesgray.com