# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CORNWELL ENTERTAINMENT, INC.<br>(f/k/a CEI ENTERPRISES, INC. and<br>CORNWELL ENTERPRISES, INC.),<br>PATRICIA D. CORNWELL, and<br>STACI GRUBER, Ph.D.,<br><br>             Plaintiffs,<br><br>      v.<br><br>ANCHIN, BLOCK & ANCHIN LLP, and<br>EVAN H. SNAPPER,<br><br>            Defendants. | Civil Action No. 09-11708-GAO<br><br>**[NEW] FOURTH AMENDED AND<br>SUPPLEMENTED COMPLAINT<br>AND JURY TRIAL DEMAND** |

## <u>Jury Trial Demanded On All Counts So Triable.</u>

This is an action in which Cornwell Entertainment, Inc., f/k/a CEI Enterprises,

Inc. and Cornwell Enterprises, Inc. ("CEI"), its sole shareholder Patricia D. Cornwell

("Ms. Cornwell"), and her spouse Staci Gruber, Ph.D. ("Dr. Gruber") (collectively

"Plaintiffs") seek damages from their former accounting firm, investment

advisor/manager, and business manager Anchin, Block & Anchin LLP and its former

principal, Evan H. Snapper, for negligent performance of professional services, breach of

fiduciary duty, breach of contract, conversion, intentional interference with advantageous

relations, equitable forfeiture, violation of the Massachusetts and New York Consumer

Protection Acts and New York common law, and defamation (i.e., libel).

**Jurisdiction and Venue**

1.     Plaintiff CEI is a corporation incorporated in Virginia with its principal place of business in eastern Massachusetts.

2.     Plaintiff Ms. Cornwell is an author whose principal residence and offices are located in eastern Massachusetts.  Ms. Cornwell is the sole owner of CEI.

3.     Plaintiff Dr. Gruber, Ms. Cornwell's spouse, is a Harvard neuroscientist whose principal residence and place of business are located in eastern Massachusetts.

4.     Defendant Anchin, Block & Anchin LLP ("Anchin") is a limited liability partnership that provides accounting and traditional and non-traditional advisory services to privately held corporations and high net worth individuals.  Anchin's principal place of business is in New York City.

5.     Although Anchin does not maintain an office in Massachusetts, from January 1, 2005 (and earlier through predecessor entity Yohalem Gillman & Company) through August of 2009, Anchin transacted business with Plaintiffs in the Commonwealth, contracted to supply services to Plaintiffs in the Commonwealth, caused tortious injury to Plaintiffs by an act or omission in the Commonwealth, and caused tortious injury to Plaintiffs by an act or omission outside of the Commonwealth while regularly doing business in the Commonwealth and deriving substantial revenue from services rendered in the Commonwealth.  This Court therefore has personal jurisdiction over Anchin pursuant to Massachusetts General Laws, c. 223A, § 3.

6.     Defendant Evan H. Snapper ("Mr. Snapper") is a former principal of Anchin whose principal residence, upon information and belief, is in Connecticut, and whose principal place of business was in New York throughout the relevant period of January 2005 through August 2009.

7.     Although Mr. Snapper does not reside in Massachusetts nor does he principally work in Massachusetts, Mr. Snapper transacted business with Plaintiffs in the Commonwealth via regular business-related visits to the Commonwealth, caused tortious injury to Plaintiffs by an act or omission in the Commonwealth, and caused tortious injury to Plaintiffs by an act or omission outside of the Commonwealth while regularly doing business in the Commonwealth and deriving substantial revenue from services rendered in the Commonwealth.  This Court therefore has personal jurisdiction over Mr. Snapper pursuant to Massachusetts General Laws, c. 223A, § 3.

8.     The citizenship of Defendants on the one hand, and Plaintiffs on the other, is diverse; and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court therefore has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.

9.     Venue is proper in this district because Plaintiffs Ms. Cornwell and Dr. Gruber maintain their principal residence and workplaces and Plaintiff CEI maintains its principal offices in eastern Massachusetts, and the real property referenced herein is located in Massachusetts.

## Preliminary Factual Allegations Applicable to All Counts

10.     Beginning in the mid-1990's, Plaintiffs CEI and Ms. Cornwell retained the services of Stanley Gillman, a principal in a New York Certified Public Accounting ("CPA") firm known as Yohalem Gillman & Company ("Yohalem Gillman") for investment advising.  CEI's and Ms. Cornwell's business needs were otherwise handled through CEI's own employees.  On April 5, 2002, following a lengthy illness, Mr. Gillman passed away.  Thereafter, Yohalem Gillman principal Ira Yohalem ("Mr.

Yohalem") informed Plaintiffs CEI and Ms. Cornwell that he would take over responsibility for their accounts.

11.     In the second half of 2004, Yohalem Gillman began transitioning toward a merger into regional CPA and advisory firm Anchin, which merger was to take effect on January 1, 2005.  Unlike Yohalem Gillman, which was a CPA firm that also offered some other financial services, Anchin holds itself out as a "full-service firm ...[that] serves privately-held businesses and high net worth individuals with a wide range of traditional and non-traditional advisory services, including financial statement preparation; tax planning ...; management and succession advisory services; litigation support; forensic accounting and valuation services; and wealth management."  Anchin offers its clients concierge style full-service management services.  In the words of Mr. Snapper to Ms. Cornwell, Anchin would "do everything for its clients including buying and delivering their toilet paper."

12.     In the second half of 2004 as the merger was approaching, Yohalem Gillman assumed an increasing role in CEI's business activities.  Ms. Cornwell was, and remains, unaware of the full extent to which Yohalem Gillman involved itself in aspects of CEI's business other than accounting and investments, in the period preceding the merger.  However, she is aware that both Messrs. Yohalem and Snapper encouraged her to terminate CEI's staff, worked with her in accomplishing that termination of CEI's staff as of early January 2005, and encouraged her to transition all of CEI's and her business needs, including investment advising, to Anchin immediately following Yohalem Gillman's merger with the latter.

13.   Ms. Cornwell is a best-selling crime novelist whose ability to write is dependent upon the ability to avoid distractions.  A quiet, uninterrupted environment, free of the distractions of managing her business and her assets, including her investments, is essential to her ability to write and to meet her deadlines.  Further, Ms. Cornwell openly acknowledges her diagnosis with a mood disorder known as bipolar disorder, which, although controlled without medication, has contributed to her belief that it is prudent for her to employ others to manage her business affairs and her investments.  Anchin was aware of Ms. Cornwell's disorder.

14.   Over the course of the several months following the January 1, 2005 merger, the tasks undertaken by Anchin grew in scope until Anchin became Ms. Cornwell's and CEI's full-service concierge business manager.  Anchin assumed full accounting responsibilities, full investment advisory and/or management responsibilities, and undertook all other aspects of CEI's and Ms. Cornwell's business affairs.  Of particular import with regard to business affairs, Anchin, particularly through Mr. Snapper, assumed responsibility for CEI's and Ms. Cornwell's real estate, including the acquisition, divestiture, and leasing of real estate.  Anchin also assumed responsibility for other major acquisitions, including automobiles and other modes of transport.

15.   By December 2004, Mr. Snapper held a Power of Attorney for Ms. Cornwell.   Examples of the functions undertaken by Anchin increasingly over time, some of which exceeded the terms of the Power of Attorney,  included, but were not limited to, the following:

(a)   All incoming revenues to CEI and Ms. Cornwell, including especially those attributable to Ms. Cornwell's books, were sent by her current agent

- 5 -

ICM and her former agent Donald Congdon directly to Anchin.  All investment income

was also sent directly to Anchin.  Anchin opened multiple bank accounts (as many as ten

at one time), determined into what bank accounts the revenues would be placed, and

moved money around among the accounts at its sole discretion.  Principals of Anchin

were the sole authorized signatories on such accounts until 2009.

(b)     Anchin paid all of CEI's and Ms. Cornwell's bills from the latter's

accounts, via self-executed internal transfers, without approval or review by CEI or

Ms. Cornwell.

(c)     Anchin handled all investment advisory and/or management

responsibilities, including the selection of all investment companies and accounts, for

CEI, Ms. Cornwell, and eventually Dr. Gruber.  Anchin selected all such investments

without input from Ms. Cornwell, CEI, or Dr. Gruber until Ms. Cornwell, upon finally

learning of the extent of the investment losses in 2009, insisted that the investments be

invested exclusively in bonds.  CEI, Ms. Cornwell and eventually Dr. Gruber received no

investment advice from anyone but Anchin, and were aware of no other advisors being

involved with their investments.  Early in the investment advisory and/or management

relationship with Yohalem Gillman, Stanley Gillman discussed with Ms. Cornwell the

wisdom of CEI and Ms. Cornwell investing conservatively, with which Ms. Cornwell

agreed.  Apart from this conversation, no one from Yohalem Gillman or Anchin ever

discussed with Ms. Cornwell or Dr. Gruber their risk tolerance or investment objectives,

and Ms. Cornwell never revoked personally or for CEI the directive that their funds be

invested conservatively.  Despite the conversation with Mr. Gillman, Plaintiffs have

recently learned that Anchin, through Mr. Snapper, granted power of attorney to one or

more investment entities to trade CEI's funds at will and directed such entities to pursue an "aggressive growth" strategy with a "high risk account that uses leverage and short-selling strategies." *See* Exhibit A hereto.

(d)  Anchin determined where Ms. Cornwell's and CEI's automobiles, Ms. Cornwell's and Dr. Gruber's motorcycles, and helicopters maintained for CEI's business purposes would be registered.

(e)  Anchin performed, or at least purportedly performed, the due diligence on all leases of real property for CEI and Ms. Cornwell, and performed, or purportedly performed, the due diligence for the acquisition, renovation, and sale of all real property for CEI and Ms. Cornwell.

(f)  Anchin prepared all tax returns for Ms. Cornwell and CEI and, at least in the year 2007, signed and filed the CEI return without review or signature by Ms. Cornwell.

16.  Anchin held the sole signatory rights on all of CEI's and Ms. Cornwell's bank accounts and did not provide bank statements to Ms. Cornwell; nor did it provide Ms. Cornwell with passwords that would have allowed her to access the bank accounts online.

17.  Anchin did not, at least with any regularity, provide investment statements to Ms. Cornwell, CEI, or Dr. Gruber, nor did Ms. Cornwell, CEI, or Dr. Gruber know with any specificity where or how their funds were invested.

18.  Anchin did not generally share with Ms. Cornwell or CEI where it chose to register automobiles, motorcycles, or the helicopter used by CEI for business purposes, nor did Anchin provide the rationale for the selection of such registration sites.

19.     Anchin did not generally share with Ms. Cornwell or CEI contract documents, including insurance policies, leases, consulting and vending contracts, or the results of due diligence efforts with regard to real property that CEI, Ms. Cornwell, or their affiliates were renting or acquiring.

20.     Anchin did not provide monthly or periodic balance sheets to CEI or Ms. Cornwell, or any other documentation from which the latter could track revenues and expenses, and determine their cash flow positions.

21.     Anchin did not regularly provide CEI or Ms. Cornwell with financial statements, or any other documentation from which the latter could determine their net worth.

22.     In July of 2009, after four and a half years in which Anchin controlled Ms. Cornwell's and CEI's business affairs and investments, including all check writing purportedly on behalf of Ms. Cornwell and CEI, Ms. Cornwell demanded information as to her net worth, and that of CEI.  Notwithstanding eight figure earnings per year during that period, CEI and Ms. Cornwell learned that their net worth, while substantial, was the equivalent of only approximately one year's net income.  They also learned that Anchin had borrowed on their behalf collectively several million dollars, comprised of mortgages for real property and a loan for the purchase of a helicopter.

23.     Ms. Cornwell terminated the relationship with Anchin effective August 31, 2009, except for the requirement that Anchin complete the 2008 income tax returns, then on extension, for her individually and for CEI.  She required that all records be delivered to her forthwith.  However, without disclosing that it was doing so, Anchin failed and neglected to turn over electronic data, until required to do so as part of its Initial

- 8 -

Disclosures in January 2010, thereby leaving CEI without information of significant importance to CEI's business, and Ms. Cornwell and Dr. Gruber without information of significant importance to their personal affairs.  This required Plaintiffs to incur substantial costs in an effort to recreate missing data.

### Count I:    Negligent Performance of Professional Services
### (Anchin and Mr. Snapper)

24.    Plaintiffs incorporate paragraphs 1 through 23 as if set forth here in their entirety.

25.    Defendant Anchin received all revenues and controlled the payment of all expenses for Ms. Cornwell and CEI for a period of approximately four and a half years, from the beginning of 2005 until mid-2009.

26.    For the majority of the relevant period, Anchin agreed to charge CEI and Ms. Cornwell on an hourly basis, but Anchin paid itself internally and an accounting for such hours was not generally provided to CEI or Ms. Cornwell, and, when provided, was lacking in detail.

27.    In or about mid-July 2007, Ms. Cornwell complained to Anchin that she did not believe that Anchin was treating CEI and her fairly with regard to amounts that Anchin was unilaterally collecting from them.  She demanded financial statements and explanations for amounts that Anchin had collected, but such documentation was not forthcoming.  By the end of 2007, Anchin had paid itself almost $1,000,000 for the preceding year from Ms. Cornwell and CEI, all without providing bills, or billing detail or back-up.

28.    Commencing in or about May of 2008, Ms. Cornwell insisted that Anchin charge her and CEI cumulatively no more than $40,000 per month.  Notwithstanding that

this agreement was reached, Anchin paid itself a supplemental $45,000 on September 30, 2008, without notice to CEI or Ms. Cornwell, and without so much as an internal invoice to explain this charge.  When Ms. Cornwell and CEI announced to Anchin that they were terminating the latter's services, Anchin contended that Ms. Cornwell's and Anchin's previous monthly payments had merely been "retainers," and that they actually owed several hundred thousand additional dollars for which she had not yet been billed.  On October 15, 2009, Anchin sent an invoice to CEI for $561,430, purportedly for unpaid services rendered between October 1, 2008 and September 30, 2009.

29.    Once files were turned over by Anchin at the conclusion of the relationship in 2009, Ms. Cornwell and CEI identified numerous checks or documents that they do not understand and for which an explanation is required.  They also encountered the absence of records regarding how certain assets had been handled and disposed of by Anchin. Examples of materials present in the file, but for which explanations are required, include the following:

(a)    electronic checks for cash that Ms. Cornwell and CEI do not believe that they authorized or approved, *e.g.*, an electronic "check" for the purported "gift" of $11,000 to a business associate who denies ever receiving the funds (which she would have returned);

(b)    an electronic check for cash in the amount of $5,000, with a memo line indicating that it was a gift from Ms. Cornwell to Mr. Snapper's daughter (whom Ms. Cornwell has never met) on the occasion of the daughter's bat mitzvah;

(c)     three $500,000 checks for the deposit on a property in Eastern Massachusetts, with only one indicated as being voided, even though only one check was necessary for that deposit;

(d)     two $50,000 deposits to the DeNiro Group (on information and belief, another current or former Anchin client), both voided, apparently for a sub-tenancy on which a final $40,000 deposit was paid directly to the tenant, with regard to an apartment that Ms. Cornwell occupied only briefly for several reasons, including a misrepresentation to the Board that Ms. Cornwell was a "cousin" of the tenant;

(e)     numerous checks or transfers to Power Motorcars (on information and belief, another Anchin client or friend of Mr. Snapper's) including several that appear to relate to vehicles that CEI and Ms. Cornwell did not purchase from Power Motorcars;

(f)     numerous reimbursements of Anchin employee expenses, including substantial expenses for travel, entertainment, and other charges, particularly by Mr. Snapper, that were not authorized by Ms. Cornwell, and for which minimal (or no) back-up is provided, including numerous reimbursements for stays at the W Hotel in Manhattan, meals, limousines, and even finance charges for Mr. Snapper's personal American Express credit card;

(g)     numerous reimbursements to Mr. Snapper for charges made on his personal American Express card for purchases that were authorized by Ms. Cornwell but which should have been properly made on CEI's American Express card;

(h)     a non-holiday season check to cash for $5,000 purportedly for $100 bills for "PC" that she does not recall requesting or receiving;

(i)     a partially executed lease for a property in Miami, Florida, without other documentation, for an apartment never occupied by CEI or Ms. Cornwell;

(j)     a deposit check for a property that failed inspection and was not purchased (with no accompanying documentation as to whether the deposit was refunded);

(k)     records of rental payments paid for an apartment that was vacated by CEI and Ms. Cornwell when it became uninhabitable because of flooding from elsewhere in the building;

(l)     tax schedules including, or checks reflecting, charitable deductions that Ms. Cornwell did not recall making or authorizing.

Examples of materials that CEI and Ms. Cornwell and CEI have been unable to locate in the files, and for which explanations are required especially as to whether certain items were included in Ms. Cornwell's net worth as of July, 2009 , include the following:

(m)     various automobile sales transactions that resulted, or should have resulted, in payments to Ms. Cornwell or CEI, including but not limited to the disposition of Ms. Cornwell's 2005 F430 Ferrari black coupe, which was picked up by or delivered to Powers Motorcars from another dealer in or about December of 2007, and whether such funds were included in Ms. Cornwell's net worth as of July 2009;

(n)     approximately $907,000 wired to Ms. Cornwell's account from Peter Harrington Books in April, June and September of 2007 upon the repurchase of forty-eight rare books from Ms. Cornwell, and whether such funds were included in Ms. Cornwell's net worth as of July 2009; and

- 12 -

(o)     disposition of the funds from the sales of various pieces of real property, and whether such funds were included in Ms. Cornwell's net worth as of July 2009.

30.     Because statements regarding CEI's, Ms. Cornwell's, and Dr. Gruber's investments were generally not provided to CEI, Ms. Cornwell, or Dr. Gruber, they cannot determine how their funds were invested or what the gains/losses were on their investments prior to 2009.

31.     From the time that Anchin assumed responsibility for CEI's and Ms. Cornwell's business in January of 2005 until the present, Plaintiffs have not, to Plaintiffs' knowledge, engaged in any major cash outlays that would explain why Ms. Cornwell's net worth at the time that she terminated Anchin's service was less than $10,000,000, despite high eight figure total earnings during that period.

32.     From the time that Anchin assumed investment management for Dr. Gruber's funds at the urging of Mr. Snapper, Dr. Gruber has lost a significant percentage of her investments.  In mid-2009, Dr. Gruber also learned that Anchin has caused the books and records of CEI to reflect that she owes CEI in excess of $100,000 for a loan that she never authorized, with regard to an indebtedness that she was never aware she had incurred.

33.     CEI and Ms. Cornwell retained Anchin after January 1, 2005 to provide full-service concierge business management, including accounting and investment services.  Dr. Gruber retained Anchin at some point thereafter to provide accounting and investment advisory and management services.

34.     Anchin and Mr. Snapper deviated from accepted standards of care for a
qualified, reasonably prudent full-service business manager in its handling of CEI's and
Ms. Cornwell's business as alleged above, and in numerous other ways including without
limitation:

(a)     Anchin, through Mr. Snapper, handled Ms. Cornwell's political
contributions, violated certain requirements pertaining to campaign contribution
bundling, misinformed her regarding such requirements, and reimbursed himself and
others improperly from CEI's or Ms. Cornwell's accounts without Ms. Cornwell's
knowledge for contributions made to political candidates.  For example, in handling Ms.
Cornwell's political contributions, Mr. Snapper knowingly and willfully caused the
Hillary Clinton for President Committee to file with the Federal Election Commission
reports that falsely identified the source of approximately $48,300 in individual political
contributions that had been reimbursed from funds associated with Ms. Cornwell, in
violation of 18 U.S.C. §§ 2 and 1001.  The United States District Court for the District of
Columbia has recently accepted Mr. Snapper's guilty plea and has entered a judgment
against Mr. Snapper for one count of violating 18 U.S.C. § 1001(a)(1) - (2).

(b)     Upon information and belief, after Plaintiffs' initial filing of this
lawsuit, Anchin and/or Mr. Snapper sought to falsely accuse Ms. Cornwell of instructing
Mr. Snapper to engage in the illegal bundling with knowledge of its illegality.  As a result
of these false allegations, Ms. Cornwell was compelled to incur substantial legal fees and
related costs to assist the government in its investigation into the unlawful campaign
contributions.

(c)     Anchin paid itself each month, in varying amounts until the last few months of the relationship, without providing CEI or Ms. Cornwell with an invoice or back-up detail, and generally without informing them that the payments had been made. Indeed, even internal invoices were only occasionally prepared, and no time records or other back-up documentation were ever provided. To the extent that internal time records were maintained at Anchin, they were often vague, incomplete, and lacking in detail as to the nature of the services provided.

(d)     Anchin, through Mr. Snapper, agreed to oversee, directly or through a consultant whom Anchin retained, the renovation of a large residence/personal office located on Garfield Road in Concord, Massachusetts. The property was intended to be CEI's principal office and Ms. Cornwell's and Dr. Gruber's principal residence. Unfortunately, Anchin provided no meaningful oversight, although it did retain, at CEI's expense, an individual from New York to fill the oversight role. That individual was rarely present, and the mismanaged renovations resulted in such significant damage to the structure, *e.g.*, removal of one or more bearing walls, and failure to make the building water-tight, that the building was rendered uninhabitable in its existing state.

(e)     While the above-referenced renovations were in progress, Mr. Snapper performed a review of the contractor's insurance to confirm that it was adequate to protect CEI as beneficial owner of the property, and Ms. Cornwell as the sole owner of CEI. Although he purchased additional personal injury insurance on behalf of the contractor at CEI's expense, he neither assured that professional services (*i.e.*, malpractice) insurance was procured by the contractor, nor caused it to be purchased on behalf of the contractor. As a result, CEI and Ms. Cornwell suffered millions of dollars

- 15 -

in unrecoverable worthless renovation costs, as well as a multi-million dollar reduction in the fair market value of the property.  With a basis of approximately $8,000,000 (although the full renovation expenditures are yet to be confirmed), the 355 Garfield Road Realty Trust of which Mr. Snapper was the sole Trustee and CEI the sole beneficiary sold the property for only $3,000,000 in the summer of 2009.

      (f)     At some point beginning no later than 2006, Anchin, through Mr. Snapper, began to list its own Manhattan address as the address of CEI, although CEI was a Virginia corporation with its principal place of business in Massachusetts.  This practice on Anchin's part included registering vehicles owned by CEI at Anchin's address, although the vehicles were not garaged there, and, with the exception of one local car maintained at the Trump Tower, were not garaged in New York at all.  Anchin then caused the helicopter to be purchased in CEI's name.  The combination of purchasing the helicopter in CEI's name, coupled with the misuse of Anchin's address as CEI's address, caused, or significantly contributed to causing, New York State to audit CEI with regard to whether a New York State sales tax would be required on CEI's purchase of the helicopter, even though the helicopter was purchased in Tennessee, and garaged in Massachusetts where CEI maintained its principal place of business.  The audit resulted in CEI being compelled to pay a compromise settlement of $187,656.36 in sales tax and interest, and to incur substantial legal fees and related costs, none of which would likely have been incurred if Anchin had refrained from using an incorrect address in New York for CEI, and purchasing the helicopter in CEI's name.  An additional New York State audit is currently underway for the years 2006 and 2007, and one is anticipated for 2008, for both CEI and Ms. Cornwell personally.

(g)     Anchin's practice of listing Anchin's address as CEI's and Ms. Cornwell's address in virtually all settings caused, or significantly contributed to causing, New York State audits of Ms. Cornwell that have already resulted in inappropriately high allocations of her income to New York and are likely to do so again for additional years now undergoing audit.  Indeed, Anchin, through Mr. Snapper, entered into agreements premised on an inaccurately high allocation of her time and revenue to New York, all without input from or notice to CEI and Ms. Cornwell.

(h)     Anchin's disorganized record keeping resulted in scattered documents relating to other clients being interspersed in CEI's files, and on information and belief, resulted in Plaintiffs' records being interspersed in other clients' files.

(i)     Anchin assumed responsibility for locating rental apartments to be used by Ms. Cornwell when visiting New York, particularly for business reasons. Anchin, acting through Mr. Snapper, failed to exercise reasonable judgment and perform appropriate diligence before committing CEI and/or Ms. Cornwell to binding leases, and failed to protect CEI's and Ms. Cornwell's interests when problems arose.  These deviations from accepted standards of care included, without necessary limitation:

    (i)     entering into a lease at One Central Park West, without determining that construction was about to commence on the two units immediately above the rented apartment, thereby rendering the apartment uninhabitable due to noise and construction dust for a period of more than a year, during all of which time Ms. Cornwell continued to pay the full rent on the uninhabitable unit;

(ii)     entering into a lease at 135 Central Park West and paying all or most of the several month balance of the lease term, even after the property flooded and was rendered uninhabitable;

(iii)    entering into a sublease on Fifth Avenue under circumstances where Ms. Cornwell and Dr. Gruber were told by Anchin after Anchin entered into the lease that they would have to pose as the cousins of the tenant, who was Middle Eastern, even though Ms. Cornwell and Dr. Gruber are both fair in complexion, hair and eye color, and do not even remotely appear to be Middle Eastern; and

(iv)     causing, or substantially contributing to causing, Ms. Cornwell to miss one book deadline entirely, such that one year's income for the *Scarpetta* series was lost, because the real estate difficulties described herein presented Ms. Cornwell with too many distractions to permit meeting her deadline.

(h)     Anchin assumed responsibility in 2007 for the resale of certain rare books by Ms. Cornwell to the rare books dealer from whom she had originally purchased them in London.  However, several other rare books and papers, including an early American edition of *Frankenstein* and early 17th century documents from the King of Spain regarding the settlement of Jamestown, were not repurchased and were held by the dealer awaiting instructions from Anchin.  Ms. Cornwell has recently learned that no instructions have been given to the dealer by Anchin, and the valuable rare books and papers remain in storage in London.

- 18 -

(i)     Anchin handled all paperwork for CEI's employees and misled at least two of them regarding their 401(k) benefits, thereby resulting in additional payments to the employees.

(j)     Anchin mishandled loans to CEI's and Ms. Cornwell's family and friends, often treating them as gifts when they were not intended to be such.

35.     Anchin deviated from accepted standards of care for a qualified, reasonably prudent investment advisor and manager in its handling of CEI's, Ms. Cornwell's, and Dr. Gruber's investments.  As set forth below, the actions of Anchin constituted violations of, *inter alia*, the so-called "know-your-customer" rules of FINRA Rule 2310 and Incorporated NYSE Rule 405.  These rules, and others, require firms acting as investment advisors such as Anchin to make reasonable efforts to obtain certain information from the customer, including the customer's risk tolerance and investment objectives.  Anchin's deviations from such rules included, without limitation:

(a)     failing to abide by the conservative investment objectives and low risk tolerance that Ms. Cornwell expressed at the outset for herself and CEI to Stanley Gillman;

(b)     failing either to abide by the conservative investment objectives and low risk tolerance that Ms. Cornwell expressed at the outset for herself and CEI to Stanley Gillman, or to determine whether Ms. Cornwell's and CEI's investment objectives and low risk tolerance had changed at any time after Mr. Gillman passed away;

(c)     failing to determine Dr. Gruber's investment objectives and risk tolerance, which were respectively relatively conservative and relatively low;

(d)     failing to keep Ms. Cornwell, CEI, and Dr. Gruber regularly apprised of the nature of their respective investments, or the gains/losses associated therewith;

(e)     making high risk investments, including at the now-defunct Lehman Brothers as late as the latter part of 2007, without the approval of CEI, Ms. Cornwell, or Dr. Gruber, notwithstanding that such investments were neither prudent nor consistent with the clients' investment objectives and risk tolerance;

(f)     without notice to CEI, granting power of attorney to one or more investment entities to trade CEI's funds at will, and directing such entities to pursue an "aggressive growth" strategy with a "high risk account that uses leverage and short-selling strategies," in express violation of CEI's clearly-stated risk tolerance, *see* Exhibit A hereto; and

(g)     failing to alert Ms. Cornwell, CEI, and Dr. Gruber to the significant decline in their investments, until their losses exceeded those in the market generally.

36.     On information and belief, Anchin deviated from accepted standards of care for a qualified, reasonably prudent accounting firm in performing accounting services for Ms. Cornwell, CEI, and Dr. Gruber.  On information and belief, such deviations included, without limitation:

(a)     filing returns in such a fashion that various audits, particularly by the State of New York, have been triggered;

(b)     failing, at least in a timely fashion, to treat international taxes in the permissible fashion to achieve maximum credits for CEI;

(c)     failing to take charitable contribution deductions for both monetary and non-monetary contributions made by CEI or Ms. Cornwell to charitable entities;

(d)     failing to have returns ready by filing deadlines, thereby necessitating extensions, or missing deadlines, and depriving the taxpayers of adequate opportunity to review and correct the returns; and

(e)     on at least one occasion, filing and signing a tax return under a power of attorney without allowing the taxpayer the opportunity to review or correct the return.

37.     The deviations from accepted standards of professional care, including those itemized above have caused, and continue to cause, significant costs and damages to Ms. Cornwell, CEI, and Dr. Gruber, including but not limited to costs associated with accounting, investment and legal services to correct Anchin's errors and omissions, as well as losses on investments, out-of-pocket expenditures, lost opportunity costs, unrecouped down payments and rental payments, and lost book revenues.

### Count II:   Breach of Fiduciary Duty (Anchin and Mr. Snapper)

38.     Plaintiffs incorporate paragraphs 1 through 37 as if set forth here in their entirety.

39.     Anchin and Mr. Snapper owed multiple fiduciary duties to Ms. Cornwell, CEI, and Dr. Gruber, including as full-service business manager, accountants, and investment advisors and/or managers.  In addition, Anchin owed a fiduciary duty to Ms. Cornwell and CEI because Anchin principal Mr. Yohalem, former Anchin principal Mr. Snapper, and perhaps others, acted as trustees and officers of various affiliated entities in whose names assets were acquired and held.  Further, Anchin and its principals, including former principal Mr. Snapper, owed a fiduciary duty to

Ms. Cornwell because they held full powers of attorney to handle all of Ms. Cornwell's business affairs, and many of their personal affairs.

40.   Anchin's and Mr. Snapper's conduct, as alleged above, failed to meet the high standards of loyalty and care owed in a fiduciary relationship and therefore gave rise to breaches of various fiduciary duties to CEI and Ms. Cornwell as a business manager, as accountants, and as an investment advisor and/or manager, and to Dr. Gruber as accountants and investment advisors and/or managers.

41.   Such breaches included, but were not limited to:

(a)   failure to abide by the "know your customer" rule in their role as investment advisors and/or managers; and blatantly ignoring Plaintiffs' risk tolerance and objectives, by, among other actions, granting power of attorney to one or more investment entities to trade CEI's funds at will and directing such entities to pursue an "aggressive growth" strategy with a "high risk account that uses leverage and short-selling strategies," *see* Exhibit A hereto;

(b)   failure to keep Plaintiffs apprised of the nature, extent, and results of their investments;

(c)   mishandling political contributions in violation of the law, and falsely accusing Ms. Cornwell of wrongdoing comprised of Anchin's and Mr. Snapper's own conduct;

(d)   allowing one or more employees to reimburse himself or themselves for expenses without receipts or other confirming documentation or notice to CEI;

(e)      in Mr. Snapper's case, improperly causing Anchin to reimburse him for personal items or expenses including finance charges on his personal credit card from CEI's accounts, without notice to, or approval by, CEI; and, on information and belief often in circumstances in which the expenses were not properly chargeable to CEI;

(f)      causing Plaintiffs to enter into transactions, such as rentals and sales of real property, acquisition of vehicles, and contracts for goods or services, that were not on terms most advantageous to Plaintiffs, with Anchin's or Mr. Snapper's clients, friends, or business associates;

(g)      on information and belief, causing Plaintiffs to enter into the transactions alleged in subparagraph (f) in circumstances that provided business benefits to Anchin and/or personal benefits to Mr. Snapper or other Anchin employees;

(h)      failing to provide Plaintiffs with itemized invoices that would allow them to determine the amount that Anchin was charging them, the nature of the services being rendered, and whether the services justified the fees being charged;

(i)      on information and belief, diverting expensive gifts from vendors intended for the Plaintiffs to Anchin's or Mr. Snapper's own use and benefit; and

(j)      without Plaintiffs' knowledge or consent, delegating services for which Anchin and or Mr. Snapper were responsible, including without necessary limitation, accounting and investment advice, to others.

42.    Ms. Cornwell, CEI, and Dr. Gruber have all suffered damages as a result of Anchin's and Mr. Snapper's breaches of their various fiduciary duties.

### Count III:   Breach of Contract (Anchin)

43.    Plaintiffs incorporate paragraphs 1 through 42 as if set forth here in their entirety.

44.     CEI and Ms. Cornwell retained Anchin on January 1, 2005 to provide full-service concierge business management, including accounting and investment services. Dr. Gruber retained Anchin at some point thereafter to provide accounting and investment services.  A contractual relationship therefore existed between Anchin, on the one hand, and, individually, CEI, Ms. Cornwell, and Dr. Gruber, on the other.  The contractual relationship was oral in part and written in part, and included e-mail modifications over time.

45.     Pursuant to the terms of the contract between Anchin, on the one hand, and, individually, CEI and Ms. Cornwell, on the other, Anchin assumed various contractual responsibilities, as alleged above, relating to its assumption of full accounting responsibilities, full investment responsibilities, and various powers of attorney for CEI and Ms. Cornwell.

46.     Pursuant to the terms of the contract between Anchin and Dr. Gruber, Anchin assumed various contractual responsibilities, as alleged above, relating to its assumption of full accounting and investment responsibilities for Dr. Gruber.

47.     As alleged above, Anchin breached its contractual duties to CEI, Ms. Cornwell, and Dr. Gruber by failing to provide the services upon which the parties had contractually agreed.

48.     Anchin's breach of contract proximately caused injury and damage to CEI, Ms. Cornwell, and Dr. Gruber, including the property, economic, and consequential damages set forth above.

### Count IV:   Conversion (Mr. Snapper)

49.    Plaintiffs incorporate paragraphs 1 through 48 as if set forth here in their entirety.

50.    CEI and Ms. Cornwell possessed title and ownership rights to all funds rightfully belonging to them.  However, by taking possession of the funds and reimbursements as set forth above, including, without limitation, those funds used for (i) the bat mitzvah check to Mr. Snapper's daughter, (ii) various stays at the W Hotel in Manhattan, (iii) meals, (iv) limousines, (v) finance charges and other items on Mr. Snapper's personal American Express credit card, Mr. Snapper has tortiously taken, wrongly detained, and intentionally deprived CEI and Ms. Cornwell of same.

51.    Mr. Snapper's intentional dominion and control over these funds was to the exclusion of CEI's and Ms. Cornwell's superior rights of possession of these funds.

52.    Mr. Snapper's conversion of these funds has proximately caused economic and consequential injury and damage to CEI and Ms. Cornwell.

### Count V:   Equitable Forfeiture (Anchin and Mr. Snapper)

53.    Plaintiffs incorporate paragraphs 1 through 52 as if set forth here in their entirety.

54.    As outlined above, Anchin and Mr. Snapper were fiduciaries to Plaintiffs and owed them special duties of loyalty.  Anchin and Mr. Snapper were repeatedly disloyal to CEI and Ms. Cornwell.  Such acts of disloyalty included without limitation receiving undisclosed financial and other benefits, charging excessive fees while failing to provide investment, accounting and business management services as contractually agreed or delegating responsibilities for same to others without Plaintiffs' knowledge or approval (such as, for example, granting power of attorney to one or more investment

- 25 -

entities to trade CEI's funds at will and directing such entities to pursue an "aggressive growth" strategy with a "high risk account that uses leverage and short-selling strategies," *see* Exhibit A hereto), mishandling political contributions in violation of the law, and, on information and belief, seeking to blame Ms. Cornwell for same in order to gain an advantage in this litigation, and causing Plaintiffs to do business on unfavorable terms with clients, vendors, and friends of Anchin and/or Mr. Snapper.

55.     These profits, benefits and advantages were gained or earned without the knowledge or consent of Anchin's and Mr. Snapper's principals, CEI and Ms. Cornwell. Such profits, benefits and advantages were thus the result of systematic and repeated acts of disloyalty by Anchin and Mr. Snapper.

56.     As a result of their disloyalty, Anchin and Mr. Snapper have proximately caused economic and consequential injury and damage to CEI and Ms. Cornwell. Defendants, as faithless fiduciaries, have forfeited the right to any compensation from CEI or Ms. Cornwell and are required to make restitution to CEI and Ms. Cornwell of all sums paid as compensation during the period of their disloyalty.

### Count VI:  Violation of M.G.L. c. 93A (Anchin)

57.     Plaintiffs incorporate paragraphs 1 through 56 as if set forth here in their entirety.

58.     Anchin is a legal "person" that engages in trade or commerce.  CEI and Ms. Cornwell are also persons who engage in trade or commerce.

59.     Ms. Cornwell and Dr. Gruber are also individual consumers with regard to certain aspects of their dealings with Anchin.

60.    On information and belief, Anchin neither maintains a place of business nor keeps assets within the Commonwealth.

61.    Anchin's conduct as alleged above, including but not limited to the specific conduct itemized in paragraphs 41 and 54, constituted unfair or deceptive acts or practices within the meaning of M.G.L. c. 93A, § 2 in the conduct of Anchin's trade or commerce as a business manager, accounting firm, and investment advisor and/or manager.

62.    Anchin's use or employment of the unfair or deceptive acts or practices described herein was a willful or knowing violation of M.G.L. c. 93A, § 2.

63.    Anchin's conduct as alleged herein violated M.G.L. c. 93A, §§ 9 and 11.

64.    Ms. Cornwell, Dr. Gruber, and CEI suffered monetary damages as a result of Anchin's use or employment of unfair or deceptive acts or practices declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two.

**Count VII:   Violation of the New York Consumer Protection Act and
Corresponding Common Law (Anchin)**

65.    Plaintiffs incorporate paragraphs 1 through 64 as if set forth here in their entirety.

66.    Anchin's conduct as described above occurred in New York as well as in Massachusetts, although the injury to Plaintiffs occurred in Massachusetts where they reside and have their principal places of business.  Therefore, the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349 (McKinney 2004), and corresponding New York common law principles, are also applicable.

67.    Anchin acts as a business manager, accountant, and investment advisor and/or manager for privately held companies like CEI and for high net worth individuals

like Ms. Cornwell and Dr. Gruber.  Anchin's acts or practices as described above,

including but not limited to the specific conduct itemized in paragraphs 41 and 54, are

consumer-oriented and have an impact on consumers at large falling into the categories

of privately held corporations and high net worth individuals.

68.    Anchin's conduct as alleged above was deceptive or misleading in a

material way, in that Plaintiffs were, *inter alia*, unaware of the full fees being charged,

unaware that their investment objectives and risk tolerance were not being honored,

unaware until recent months how their money was being invested and how their

investments were performing, unaware that various vehicles and CEI's helicopter were

being registered in New York with resulting tax disadvantages, unaware that various gifts

may have been made in their names without "credit" to or acknowledgement of them,

unaware that their real estate project was not being properly managed, and unaware of the

lack of due diligence undertaken with regard to their rental properties.

69.    CEI, Ms. Cornwell, and Dr. Gruber were all injured and suffered actual

monetary harm by reason of Anchin's deceptive or misleading conduct, such harm

including without necessary limitation loss of investments, loss in income, reduction in

net worth, additional taxes and interest, and loss of money in the form of fees and

expenses inappropriately charged.

## Count VIII:  Defamation (Libel) (Anchin)

70.    Plaintiffs incorporate paragraphs 1 through 69 as if set forth here in their

entirety.

71.    During the period of the on-going relationship between Anchin on the one

hand, and CEI and Ms. Cornwell on the other, Anchin paid itself for the services rendered

generally without consultation with, or rendering invoices to, CEI or Ms. Cornwell. After Anchin was informed that Plaintiffs were terminating the relationship as of August 31, 2009, Anchin stated for the first time that it would seek to charge CEI and Ms. Cornwell additional sums of money for services allegedly rendered.  However, no bill or invoice was forthcoming at that time.

72.   On October 13, 2009, Plaintiffs filed the original Complaint in this action and served it immediately by certified mail upon Anchin.  At that time, Anchin had rendered no invoices.

73.   At 5:55 p.m. on October 15, 2009, an Anchin employee named Jeffrey Vorchheimer emailed an invoice to CEI's counsel stating that Anchin's charges for the period October 1, 2008 through September 30, 2009 were $971,430, that the agreed upon $40,000 monthly payments were simply "on account," and that the total amount due for that period was therefore $561,430.  Mr. Vorchheimer further stated that another invoice would be issued in the future for "October's services." *See* Exhibit B hereto.

74.   CEI and Ms. Cornwell responded, through counsel, on Friday, October 16, 2009, requesting supporting documentation including time records for services and receipts for expenses, so that CEI could "proceed in a prudent and reasonable manner in determining whether payment of the invoice is warranted in whole or in part."  *See* Exhibit B hereto.

75.   On Monday, October 19, 2009, Mr. Vorchheimer acknowledged on behalf of Anchin receipt of the request, and stated that he had "begun work to collect the information you requested, and hope to have something back to you by week's end" (i.e.,

by Friday, October 23, 2009).  CEI's counsel immediately responded, "thank you.  We'll look forward to receiving the information."  *See* Exhibit C hereto.

76.    Rather than providing the documentation supporting the unitemized $561,430 invoice as promised, on or before October 23, 2009 Anchin gave a statement to *Daily Finance* through an agent authorized to speak on its behalf, to wit, Anchin's attorney Thomas Manisero, claiming (a) that Ms. Cornwell had suffered "no losses" in her accounts with Anchin, and (b) that the filing of this litigation constituted a preemptive lawsuit designed to avoid paying fees owed to Anchin.

77.    These statements made by Anchin through an agent authorized to speak on its behalf were published on-line by *dailyfinance.com* on October 23, 2009 and disseminated to a large number of Internet readers and browsers interested in matters of business and finance.  The statements remain available to the public through such search engines as Google.

78.    Because Anchin did not provide Plaintiffs with investment summaries or histories until they insisted on a transfer of all remaining funds to bonds in 2009, Plaintiffs cannot know with certainty what happened to their funds before that transfer. However, Plaintiffs do know that they did not owe Anchin any fees when Anchin authorized its agent to make a false statement to the contrary.  Anchin paid itself from CEI's funds throughout the period of the relationship.  In the unlikely event that Anchin failed to pay itself any fees to which it was entitled, Anchin did not provide an invoice until after the commencement of this litigation.  Nor did Anchin provide the requested – and promised – documentation to support the belated unitemized invoice so that Plaintiffs could determine whether all or any part of the claimed fees are actually due.

79.     The statements that Anchin authorized is agent to make, particularly with regard to the purported motivation of filing litigation to avoid fees that were due and owing, were false, discredited Ms. Cornwell and CEI with regard to their creditworthiness and trustworthiness in a business setting, and impaired Ms. Cornwell's and CEI's standing in the minds of a considerable and respectable portion of the business community.

80.     Anchin knew the statements to be false and nonetheless authorized the false statements to be made with actual malice in order to do injury to the business reputations of CEI and Ms. Cornwell, as to whether they are creditworthy and assume responsibility for their debts.  Anchin authorized the false statements in an effort to shield itself from the import of its own conduct as more fully alleged above, and did so in a context, to wit: an interview with the press, that is not entitled to any privilege or protection.

81.     On information and belief, and based on the circumstances surrounding this lawsuit, Anchin has made similar false statements regarding CEI's and Ms. Cornwell's purported motivation to avoid paying its debt to Anchin, to clients, other reporters, and other categories of persons.

82.     Anchin's statements have caused, and continue to cause, injury to Ms. Cornwell's and CEI's business reputation, the full extent of which is not yet even known to Plaintiffs.

### Count IX:   Intentional Interference with Advantageous Relations / Unjust Enrichment (Mr. Snapper)

83.     Plaintiffs incorporate paragraphs 1 through 82 as if set forth here in their entirety.

- 31 -

84.     CEI had, and has, an account with American Express for which it receives so-called "Membership Rewards" points for purchases made on the card.  These Membership Rewards points may be exchanged for goods and services of value from various third-party retailers and vendors.

85.     As set forth above, by intentionally and maliciously charging expenses on his personal American Express card that should have been properly charged on CEI's American Express card,  Mr. Snapper improperly interfered with CEI's legally protected interest in its economic relationship with American Express by depriving CEI of Membership Rewards points and the consequential goods and services of substantial value for which they would have been exchanged.

86.     Mr. Snapper directly benefitted from his improper interference by receiving for himself the Membership Rewards points to which CEI was rightfully entitled.

87.     Mr. Snapper has thus proximately caused economic and consequential injury and damage to CEI.

**WHEREFORE,** Plaintiffs pray:

    1.     for the right to further amend their Complaint as appropriate upon completion of the audit undertaken by their forensic accountants;

    2.     for recovery of all compensation paid by Plaintiffs to Defendants for the period of their disloyalty, to wit: from January 1, 2005 through September 2009;

    3.     for damages as determined by the jury awardable to each Plaintiff;

    4.     for punitive damages as appropriate under M.G.L. c. 93A;

5.  for an award of their reasonable attorneys' fees and costs under

    M.G.L. c. 93A;

6.  for an award of Ms. Cornwell's reasonable attorneys' fees and costs

    in connection with Mr. Snapper's improper campaign contribution

    bundling;

7.  for punitive damages as appropriate under the New York Consumer

    Protection Act and under New York common law for unfair

    consumer practices;

8.  for an award of their reasonable attorneys' fees and costs under the

    New York Consumer Protection Act;

9.  for interest and costs as allowed by law; and

10. for such other and further relief as this Court deems appropriate.


PLAINTIFFS CLAIM A JURY ON ALL CLAIMS SO TRIABLE.


Respectfully submitted,

CORNWELL ENTERTAINMENT, INC.,
PATRICIA D. CORNWELL, and
STACI GRUBER, Ph.D.

By their attorneys,


/s/ Dan Krockmalnic
Joan A. Lukey (BBO # 307340)
Dan Krockmalnic (BBO # 668054)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199

(617) 951-7171
joan.lukey@ropesgray.com
Dated: January 31, 2011                    dan.krockmalnic@ropesgray.com

25896138_1

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Fed. R. Civ. P. 5(b) and Local Rule 5.2(b), I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 31, 2011.

/s/ Dan Krockmalnic
Dan Krockmalnic

Dated:  January 31, 2011