1

1            UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3                         No. 1:09-cv-11708-GAO

4

5   CORNWELL ENTERTAINMENT, INC, et al.,
              Plaintiffs

6

7   vs.

8

9   ANCHIN, BLOCK & ANCHIN, LLP and EVAN SNAPPER,
              Defendants

10

11

12                    *  *  *  *  *  *  *  *

13

                    For Hearing Before:
14             Judge George A. O'Toole, Jr.

15
           Final Pretrial (Motions in Limine.)
16

17                 United States District Court
                   District of Massachusetts (Boston)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Wednesday, December 12, 2012

20                    *  *  *  *  *  *  *  *

21

22        REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
23             United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25

2

1                    A P P E A R A N C E S

2


3    DAN KROCKMALNIC, ESQ.
     JUSTIN J. WOLOSZ, ESQ.
4    AMY D. ROY, ESQ.
     JACOB SCOTT, ESQ.
5        Ropes & Gray - MA
         Prudential Tower
6        800 Boylston Street
         Boston, Massachusetts 02199-3600
7        (617) 951-7000
         Email: Krockmalnic@ropesgray.com
8        For plaintiffs

9


10   THOMAS R. MANISERO, ESQ., ESQ.
         3 Gannett Drive
11       White Plains, New York 10591
         (914) 323-7000
12       Email: Thomas.manisero@wilsonelser.com
     and
13   JAMES M. CAMPBELL, ESQ.
     CHISTOPHER B. PARKERSON, ESQ.
14       Campbell, Campbell, Edwards & Conroy, P.C.
         One Constitution Plaza
15       Boston, Massachusetts 02129
         (617) 241-3000
16       Email: Jmcampbell@campbell-trial-lawyers.com
         For Defendants
17

18

19

20

21

22

23

24

25

3

```
 1              P R O C E E D I N G S
 2              (Begins, 2:15 p.m.)
 3              THE CLERK:  For a motion hearing, the case
 4    of CEI Enterprises, et al versus Anchin, Block & Anchin,
 5    which is Docket 09-11708.  Would counsel identify
 6    yourselves for the record.
 7              MR. WOLOSZ:  Good afternoon, your Honor.
 8    Justin Wolosz here on behalf of the plaintiffs.
 9              MR. KROCKMALNIC:  Good afternoon, your
10    Honor.  Dan Krockmalnic also on behalf of the
11    plaintiffs.
12              MS. ROY:  Good afternoon, your Honor.  Amy
13    Roy also on behalf of the plaintiffs.
14              MR. SCOTT:  Good afternoon, your Honor.
15    Jacob Scott on behalf of the plaintiffs.
16              MR. CAMPBELL:  Good afternoon, Judge, my
17    name is James Campbell.  I represent the defendants,
18    Anchin, Block & Anchin and Evan Snapper.
19              MR. MANISERO:  Good afternoon, your Honor,
20    Thomas Manisero, also representing the defendants.
21              MR. PARKERSON:  Christopher Parkerson,
22    representing the defendants.
23              THE COURT:  Okay.
24         Well, we have a large number of in-limine
25    motions and I don't know that I -- the papers are ample
```

4

1    on the case, I'm not sure I need to hear about every

2    single one of them.  I think the more important ones

3    relate to the motions to exclude the opinions of

4    experts, so I would like to start with those and we may

5    or may not hear argument on the other issues.

6          These are mostly defense motions.

7    Mr. Manisero, are you going to be arguing?

8          MR. MANISERO:  I will be arguing, yes, your

9    Honor.

10          THE COURT:  Um, I have my own order here --

11          MR. MANISERO:  Okay.

12          THE COURT:  Well, it's mostly the numerical

13    order of the docket, basically, I guess.  The first one

14    is Erickson.

15          MR. MANISERO:  Um, Mr. Erickson, your

16    Honor, um -- give me one second.

17                (Pause.)

18          THE COURT:  You went from easy to hard, was

19    that your order?

20          MR. MANISERO:  Yeah, I did, your Honor.

21                (Laughter.)

22          MR. MANISERO:  Our motion with respect to

23    Mr. Erickson's opinions, your Honor, quite frankly is

24    that he professes to establish a standard of care and

25    departure from a standard of care which is inapplicable

1    to the case.

2           The defendants in this action are being charged

3    with professional negligence in their capacity as

4    business managers.  Mr. Erickson seeks to establish a

5    standard of care for somebody who is an "owner's

6    representative," as that term is defined in the

7    architectural terms, the construction terms.  Um, we

8    don't agree that his standard of care is the standard of

9    care that would be applicable to the defendants in this

10   case.  So we think that his opinion would not be helpful

11   to the Court in that regard.  We did not operate as

12   owner's representatives, we were not construction

13   people, we were accountants who pay bills.  That's the

14   substance of our venture.

15           THE COURT:  All right.  Mr. Krockmalnic?

16           MR. KROCKMALNIC:  Your Honor, I think it is

17   -- at a bare minimum it's a fact dispute as to whether

18   the defendants in this case, Anchin, Block & Anchin,

19   Mr. Snapper, were merely accountants who pay bills in

20   this case, as Mr. Manisero just put it, or whether

21   they're concierge business managers where they handled

22   substantially every aspect of the plaintiff's affairs as

23   the plaintiffs have alleged and as we believe the facts

24   amply demonstrate.

25           We believe that one facet of the manner by

1    which they helped to manage the plaintiff's life as the

2    concierge business managers was by agreeing in their

3    offer letter, which it is not disputed, it's the

4    operative offer letter in this case, to oversee, um, the

5    disposition of real estate, among other things, and in

6    relation to that we also believe that, at a bare

7    minimum, your Honor, it's a fact dispute and therefore

8    an improper venue or at least time to decide to exclude

9    the expert testimony of Mr. Erickson, because we do in

10   fact believe that the defendants did in fact assume the

11   role of owner's representative in this case.

12           There's no dispute from defendants, in their

13   papers, that Mr. Erickson was amply qualified to give

14   the opinion that he gives.  They simply believe that

15   he's testifying to a standard of care that does not

16   apply here, and we believe that is, at a bare minimum, a

17   fact dispute, that there are more than sufficient facts

18   to support that, and that it is for the jury to decide,

19   in the first instance, whether or not the facts support

20   the testimony that Mr. Erickson is expected to give as

21   to what the duties of Anchin, Block & Anchin and then

22   Mr. Snapper in this case are.

23           THE COURT:  Mr. Erickson, in his report,

24   describes the functions as being a contract

25   administrator or in a sense a contract manager.  I don't

7

1  think he used a "project manager," he assigned that to

2  somebody else.  But it seems to be used as a term of art

3  in the construction industry, the construction, um,

4  manager.

5          The complaint -- well, let's take it that the,

6  um -- that you're correct that they're not mere

7  accountants, just adding up numbers, but concierge

8  business advisors and so on and so forth.  Um, I don't

9  read Mr. Erickson's report to say that it is a breach of

10  the duty of the family office concierge business manager

11  to have failed to do what was not done, but that it

12  would have been a breach of a contract supervisor in a

13  construction context.

14          Do you read the report differently?

15              MR. KROCKMALNIC:  You're reading it

16  correct, your Honor, and that is quite simply because

17  Mr. Erickson is an architect and has -- has a project

18  manager, has his own representative, and not as a

19  concierge business manager.

20              THE COURT:  He says that he thinks they put

21  themselves in the position of being a construction

22  manager, but I'm not sure that's an admissible piece of

23  evidence, that he thinks that.  So the question is

24  whether the facts would fairly permit a neutral

25  factfinder from concluding that that's the role that

1    we're not -- not simply that they were perhaps

2    overseeing in some sense the project, but they were

3    acting in a professional capacity as a construction

4    contract manager, um, and I'm not sure the facts will

5    permit that conclusion.

6            In other words, if you had a spectrum of

7    supervision, taking the architects and the builders and

8    put them on one side, taking the owner and put him on

9    the other side, it seems to me that the owner's

10   representative, as it might be referred to in this case,

11   is much closer to the owner on that spectrum than to the

12   contract people.

13           And so, I mean, I think my reaction is that the

14   defendants are right, that this is not the right person

15   to give this advice.  You have concierge business

16   people, if they come in and say a concierge business

17   manager who failed to do the following would have

18   violated the standard of care of a contract -- I mean,

19   of a concierge business manager, that would be fine.

20   They seem to be saying that a contract business manager

21   should have done also the work of a construction

22   manager, and I'm not sure there's a basis for that.

23           MR. KROCKMALNIC:  Your Honor, we would

24   respectfully suggest that there is ample basis for that

25   in the evidence.  Apart from the content of

1    Mr. Erickson's report itself, we would suggest there is

2    ample evidence in what has been a lengthy discovery

3    process of many depositions and of hundreds of thousands

4    of pages produced by both sides.

5         So if your Honor would indulge me, I could give

6    you several examples of where we believe -- again, at a

7    minimum, it is a question of fact, as you correctly say,

8    your Honor, for the jury to decide whether or not Anchin

9    stepped into the role as concierge business managers of

10   overseeing the renovations of the Garfield project.  And

11   if you'd like us to give that to you, they're all

12   contained in our briefings.  I would be happy to recite

13   some of them here.

14        When Mr. Snapper refers to Ziggy Rutan, whom

15   you referenced earlier without giving his name as the

16   project manager, and Mr. Snapper said, "My project

17   manager," "I hired him here as my project manager."

18   When Mr. Snapper talks about -- in responding to Bernie

19   Osgood, who there's no dispute in this case is the

20   general contractor, he said, "I have given out over

21   $2700," "I have paid over $2700 in 2006 and that doesn't

22   work for me."

23        Um, there is testimony -- there is documentary

24   evidence, your Honor, suggesting or demonstrating that

25   defendants had clear direct oversight capacity of

1   Mr. Osgood and required him to jump -- to take certain

2   steps, to jump through certain hoops in the work that he

3   did.

4              THE COURT:  Yeah, I guess that's not my

5   problem because I think an owner might do exactly the

6   same thing, an owner simpliciter might do exactly the

7   same thing.  The question is whether they're acting in a

8   professional capacity as a construction manager and

9   that's what I see missing in this.  So they're acting

10  for the owner and giving instructions, but I'm not sure

11  any owner wouldn't do the same.

12             MR. KROCKMALNIC:  Precisely, your Honor.

13  And our position is, and we believe that Mr. Erickson's

14  report suggests that it is not by virtue of being a

15  professional construction manager that the duties of

16  care that Mr. Erickson opines attach to Anchin do in

17  fact attach.  It is exactly as you put it, your Honor,

18  that is by virtue of stepping into the shoes of the

19  owners, and that is what the owner's representative is.

20             What Anchin did here in this case was to step

21  in the shoes of Ms. Cornwell and of Dr. Gruber to let

22  them live their lives, as an author and as a

23  neuroscientist respectively, and to make sure, as the

24  representative of the owners quite literally, that the

25  construction and renovation project at the Garfield

11

1    property went on as it should have gone.

2          So it's the equivalent, your Honor, of the same

3    types of duties that would arise with respect to, um --

4    well, I take back that last one.  That's our position,

5    your Honor.

6                THE COURT:  Okay.  Anything else?

7                MR. MANISERO:  Actually, your Honor, what

8    the evidence does show is that when Mr. Snapper was

9    asked to get involved with this construction project,

10   recognizing his limitations, he did call and introduce

11   the owner's representative.  He may not have called him

12   by the name that the literature for the architectural or

13   construction industry used, but they got somebody in to

14   be the owner's representative and that was Mr. Rutan,

15   and that just further indicates that this -- that these

16   people were not professionals in that sense and held to

17   that standard that Mr. Erickson seeks to hold them to.

18               MR. KROCKMALNIC:  Briefly, your Honor, if I

19   may respond to that?

20               THE COURT:  Yes.  Go ahead.

21               MR. KROCKMALNIC:  Just simply -- we dispute

22   a lot of things with defendants.  I think one thing that

23   I don't think defendants would take issue with, but I'd

24   like to hear if they do, is that this project evolved

25   over time and that what -- the roles that were assumed

12

1    by Anchin and by Mr. Snapper at a slice in time, let's

2    say at the beginning of the renovation project, were

3    decidedly different than the roles that they had most

4    clearly assumed, um, both de facto and de jure, we would

5    argue, by the end of the project.

6                    THE COURT:  Okay.

7             Well, I'm going to grant this motion.  I think

8    that this is not -- it's simply the wrong expertise to

9    be applicable to these people.  It doesn't say that what

10   they did violated, if it did violate it -- well, maybe

11   it was also a default as concierge business managers,

12   but I don't think there's a basis in the record for the

13   proposition that they were professional contract

14   managers in the construction industry, which is the

15   direction of the Erickson report.

16            Now, let's move to Nolan.

17                    MR. MANISERO:  Mr. Nolan was offered --

18   there's two parts of Mr. Nolan's report that we

19   challenge, your Honor.  Mr. Nolan is a certified public

20   accountant and he does provide concierge business

21   management services.  One part of his report that we do

22   challenge, and we'll see this challenge coming up again

23   with Mr. Jenkins and with Mr. Macknin, when he professes

24   to opine about fiduciary responsibilities.

25            We submit to your Honor that it is your realm,

13

1    not the realm of an expert witness to instruct the jury

2    on what constitutes or does not constitute a fiduciary

3    duty or a breach.  That is not the realm of the expert.

4    So we have to -- we move to have that aspect of

5    Mr. Nolan's report stricken.

6            With respect to his opinions concerning

7    concierge business management services, your Honor,

8    Mr. Nolan cites no standards, no professional

9    standards.  He does not attempt to measure the

10   defendants' conducts against those professional

11   standards.  Therefore we submit that his opinion, his

12   report should be stricken because it's completely

13   unhelpful to the Court.

14            THE COURT:  Okay.  Mr. Wolosz.

15            MR. WOLOSZ:  Thank you, your Honor.

16            I guess I'll take those -- the two points that

17   counsel just made in the order that they were offered.

18            The first complaint was that Mr. Nolan is

19   improperly offered as an expert on the fiduciary

20   standards.  Here we just disagree with the defendants.

21   Experts testify all the time as to what the standard of

22   care is.  They need to because we're dealing with

23   concierge business management.  We're going to have a

24   jury that will have, we can presume, very little if any

25   experience on what a concierge business manager does and

14

1  what the relevant standard of care is or, you know,

2  fiduciary duty is in the context of being a concierge

3  business manager.

4          And, you know, in preparation for this hearing

5  we pulled a couple of additional cases which are not

6  cited in our papers, but one which I would alert the

7  Court to -- and this is **514 Broadway, Incorporated** --

8  sorry, **514 Broadway Investment Trust,** it's 816 F. Supp.

9  2d at 128, from the District of Rhode Island, 2011.

10          Now, this case comes up in the context of an

11  attorney malpractice action, but it's a comparable

12  issue, and the relevant quote says:  "As with

13  negligence-based legal malpractice claims, expert

14  evidence is required to establish the appropriate

15  fiduciary duties owed by the attorney, unless such

16  duties are a matter of common knowledge."

17          That's exactly the situation that we have here,

18  your Honor.  Someone needs to tell the jury what the

19  duties of care, what the fiduciary duties are when

20  you're acting as a concierge business manager and it

21  requires that context.  So Mr. Nolan is being offered to

22  explain what a concierge business manager is, what the

23  service provides, and how --

24          I think, you know, another important point that

25  he provides which is relevant to the fiduciary standard

1   is just how all-encompassing what concierge business

2   managers do, you know, how they really take over making

3   decisions on behalf of people.  They're not simply

4   providing a service like, you know, I would want and

5   hire somebody to fill out forms.

6          As part of the issue with -- you know, we have

7   this back and forth, which comes up in the papers with

8   respect to Mr. Nolan, on this question of whether it's

9   purely an accounting standard that applies or whether

10   it's something broader.  And in thinking about this, um,

11   you know, one example, one easy example which I think is

12   helpful -- it may be helpful for the Court, is to think

13   about the preparation of tax returns.

14          If I go to H & R Block and I sit across the

15   table from a person who's preparing my taxes, I

16   understand that there are certain professional

17   standards, and they may be the AICPA standards, um, that

18   govern, and that it is not, under normal circumstances,

19   a fiduciary relationship.  And that tax professional

20   asks me questions and says, "Okay, do you have any of

21   this?"  you know, and I provide receipts, and eventually

22   that tax professional fills out the form and it gets

23   filed.

24          Here there's no one on the other side of the

25   table because they had so taken over, um, the

1    administration of the plaintiff's entire, you know, the

2    management of their entire lives, that they were asking

3    themselves the questions, they were asking the questions

4    and giving themselves the answer, they were completely

5    in charge of that whole process.  And that's part of the

6    reason why, you know, we argue, and we think that the

7    cases support the notion, that the standard of care is

8    so much higher.  That's what we need someone like

9    Mr. Nolan to explain, that there is -- you know, this is

10   what a concierge business management service does and

11   they have these duties.

12           The second complaint that counsel made was that

13   -- and we see this in several of their motions, was that

14   Mr. Nolan asserts no basis for the standard of care that

15   he provides.  And the first thing I'd like to do is talk

16   about the case that they cite for this proposition

17   because, um, this is the -- the proposition that they

18   cite is that this expert isn't really testifying based

19   on a standard, this is just the ipse dixit opinion of

20   the expert saying sort of "Trust me" and that violates

21   the standard of care.

22           Well, the case that they cite to you, um, it's

23   a case called *General Electric vs. Joiner*, from 1997,

24   that case involves, um, epidemiological studies that the

25   Court determined did not support the conclusion.  Um, I

1    believe that case involved cancer and PCP.  Um, I don't

2    have those notes in front of me.

3            But what the Court is essentially saying is the

4    Court is saying this, "Look, when an expert is opining

5    on something and saying, 'I'm relying on this study,'

6    the Court's saying -- the Court gets to look at the

7    study and the Court gets to apply its common sense and

8    say, 'Wait, that's not what it says.'"  That's the point

9    that is being made in that case.  And you can understand

10   why a rule would come out of that, which is, "No, the

11   expert can't take irrelevant studies and say, 'Well, I

12   don't know, I'm kind of relying on those.  Trust me.

13   Here's the answer'."  That's not what Mr. Nolan does.

14   What Mr. Nolan does is he says, "I've been working 31

15   years for high-net-worth individuals, working with them

16   on all kinds of tax and other planning and since 1999

17   I've been working in this business," this business that

18   many of us had never heard of before this case.  This is

19   what he does for a living.  And so he's being offered to

20   explain that.

21           The cases recognize and I think the defendants

22   concede that it is perfectly appropriate for an expert

23   to testify based on experience.  What they are really

24   trying to argue -- and, you know, this is just another

25   way of getting at the same argument, is that they're

18

1    trying to ask questions about the AICPA standards and

2    then when, when they did this in the deposition, when

3    Mr. Nolan doesn't rely on the standards they say, "See,

4    he has no basis for his opinions." But they're going

5    down the wrong road because the AICPA doesn't control

6    the matters about which Mr. Nolan is opining.

7            Um, if the Court has any questions?

8            THE COURT: No. Okay.

9            MR. MANISERO: Yes, your Honor. Getting

10   back to the fiduciary duty issue for a moment.

11           In our opposition to the plaintiffs' motion,

12   um, directed at Mr. Nolan's report, um, we cited a case

13   that comes from the Southern District of New York

14   earlier this year, it's **Veramoner Paysler,** and I

15   recommend that case to you, your Honor, because in that

16   case the court specifically refused to accept the

17   testimony of a proffered expert concerning fiduciary

18   standards of care because those go to the ultimate legal

19   issues in the case.

20           There are other cases that are cited in that

21   opposition that also tell us that unless you're in a

22   situation where a fiduciary responsibility or a

23   fiduciary duty is imposed as a matter of law, and those

24   are the rare instances, the issue of whether or not a

25   fiduciary duty exists is a question of fact, and that is

1    a question that the jurors are ultimately going to have

2    to determine based on what the Court instructs.

3            We do not believe, and we submit again, that it

4    is not the venue or the purview of an expert witness to

5    come in here and instruct this jury on a fiduciary duty

6    -- what creates a fiduciary duty or what creates a

7    breach of a fiduciary duty.  Furthermore, if you look at

8    Mr. Nolan's report and you look at his deposition

9    transcript, he wasn't able to define that in any

10   meaningful way for the Court.  So we submit to you that

11   that is not within his purview.

12           With respect to the other aspect of our motion,

13   um, Mr. Nolan's report is absolutely ipse dixit, "I said

14   it and therefore it is."  He does not cite the AICPA

15   standards.  In fact he wasn't even familiar with the

16   AICPA standards.  He wasn't able to quote them.  The

17   standards did not govern his performance day in and day

18   out.  It is ipse dixit and therefore, we would submit,

19   it would not be helpful to this court or to this jury.

20           THE COURT:  Okay.

21           MR. WOLOSZ:  May I, your Honor, just

22   briefly?

23           THE COURT:  No, it's not necessary.  On

24   this one I agree with the plaintiffs, um, the motion is

25   denied.

1        Now, let me just say that when -- and this may

2    repeat itself, um, later, but a denial doesn't mean that

3    some issues are not available at trial if the evidence

4    comes in any particular way, so -- we can always

5    readdress it.  But for now I think this is, um, sort of

6    an example of what I was referring to in the previous

7    motion, this is a guy who is doing the same kind of work

8    as the defendants and I think his testimony is

9    appropriate.  So that that motion is denied.

10        Next, I guess in sequence, is Jenkins.

11            MR. MANISERO:  Our motion with respect to

12   Mr. Jenkins, your Honor, is very similar to the motion

13   with respect to Mr. Nolan.

14        Mr. Jenkins is a CPA.  He proffers -- again, he

15   proffers opinions about fiduciary responsibilities and

16   breaches of fiduciary responsibilities.  Our position

17   with respect to Mr. Jenkins in that regard is the same

18   as it was with respect to Mr. Nolan.  That is not his

19   purview as an expert, that is, again, we submit, the

20   purview of this Court to instruct the jury.

21        Mr. Nolan's report further suffers from the

22   same malady as Mr. Nolan in terms of relating the

23   defendants' conduct to some discernible standard of

24   care.  Mr. Nolan does -- I mean, excuse me, Mr. Jenkins

25   does acknowledge that the applicable standard of care

21

1    here are the AICPA rules governing consulting services.

2    Um, but in his report, however, he makes no effort to

3    equate the defendants' conduct to that standard and show

4    how there is a departure from that standard, and that's

5    what his responsibility is here and so we think that his

6    report fails.

7            We have another argument, another problem with

8    Mr. Jenkins' report and that is that it was belatedly

9    amended right on the eve of his deposition and in

10   response to the deposition that plaintiffs took of the

11   defendants' proposed expert on investment damages.

12   Mr. Jenkins' original report, which was timely, made no

13   reference to any issues regarding the handling of the

14   plaintiff's investment accounts.  At the last minute,

15   just before his deposition, without leave of Court, they

16   submit they served us with an amended report.  We would

17   submit that at a minimum that amended report should be

18   stricken and he should be held to his original report.

19                   THE COURT:  Okay.

20                   MR. WOLOSZ:  Thank you, your Honor.

21           It's -- in some ways it is the same issue.

22   Mr. Jenkins does acknowledge that the AICPA standards

23   are relevant and he does talk about them, he does not,

24   as defendants just suggested, concede that the AICPA

25   standards alone govern, because Mr. Jenkins recognizes

1    that this is a fiduciary relationship.

2         He's a certified public accountant, he's

3    accredited in business valuation, he's certified in

4    financial forensics, he's a certified fraud examiner,

5    and he's a certified money laundering specialist.  A big

6    part of what he does is look back and try to unravel

7    financial transactions and explain what happened and

8    explain whether the transactions were undertaken for a

9    proper purpose and in conjunction with the applicable

10   standard of care.  That is exactly what he's being

11   offered to do here.  He's on the finance side and he's

12   talking about finances.

13        He references the AICPA standards because of

14   course they're applicable to certain things, um, but

15   that does not mean that they control.  It also does not

16   mean that his standard is picked out of the air or

17   picked out of nowhere because a person with the

18   extensive experience that Mr. Jenkins has in finance

19   understands what a fiduciary duty means in a particular

20   context.  And again that is what he's being asked to

21   provide, it's "What is the fiduciary duty in a

22   particular context?"  And just to give a couple of

23   examples.

24        In one case he looks at the taxes, the way they

25   were prepared, and he comments and he says, "Well,

1    planning didn't take place because -- because if it had,

2    then the defendants wouldn't have listed this as the

3    address because that had tax ramifications."  That's

4    perfectly within the proper scope of this expert.

5            Another example he uses is he says, "Well, I

6    tried to just figure out all the bank accounts and

7    unravel the transactions and frankly there were so many,

8    there were -- you know, in some cases opening ten bank

9    accounts at the same time, um, really more than you

10   would need for the kind of business that these folks

11   were putting on."  Again, it's explaining that in

12   context.  Somebody has to give that kind of information

13   to the jury, otherwise, I mean, to -- in order to help

14   them understand whether this truly was too many accounts

15   being opened and what that means.  He's going to

16   provide, um, assuming the Court allows him to testify,

17   that relevant standard of care.

18           With respect to the supplementation of the

19   report, the, um -- it's two paragraphs, your Honor, and

20   the report was supplemented because the previous

21   business day before the supplemental report was

22   provided, the defendants' witness testified with respect

23   to some important things.  And so the report was amended

24   to add these two paragraphs that relate more

25   specifically to investment management.

1         There was no prejudice.  There has been plenty

2    of time -- they had a report a full two days before

3    Mr. Jenkins' deposition.  Certainly they could form

4    whatever questions they needed to form as to those two

5    paragraphs.  And that's why we would suggest that

6    there's no reason to strike any of the report, including

7    those two paragraphs.

8              THE COURT:  Okay.

9              MR. MANISERO:  Just very briefly.

10         Counsel makes reference to Mr. Jenkins'

11   opinions about the tax returns and the use of addresses,

12   et cetera.  I just remind the Court that those issues

13   are no longer in the case.  That was a summary judgment

14   motion that was granted as being unopposed.  And so

15   Mr. Jenkins' opinions with respect to those matters have

16   no bearing on any of these issues.

17         With respect to the supplementation, I would

18   direct the Court -- if it's considering allowing that

19   amended report, to just look at what the opinion was.

20   The opinion really was, in retrospect, um, he says that

21   these defendants should have predicted where the market

22   was going and should have taken money out of investment

23   accounts when they knew that the world was financially

24   going to come apart and pay off loans.  Um, again, not

25   something that is based on any established standard of

1     care.  It's entirely his hindsight, ipse dixit.  I

2     submit to you that that's not helpful.

3               THE COURT:  Okay.

4        I think there's a close question there because

5     I think Jenkins' report seems a little "breezy," I would

6     say, um, it doesn't seem as substantial as Nolan's, but

7     I'm going to deny the motion for now and will just say

8     that I have reservations about it and we'll see how the

9     evidence develops at trial.  Um, he is in the right

10     subject matter, but his opinions seem very general and

11     I'm uncertain about them.  But for now I'm not going to

12     conclude that there's no foundation that could be

13     established.

14        As to the supplemental, I don't think there's

15     any substantial prejudice, so that's not a reason for

16     excluding them.

17        Um, Kaplan is next.

18          MR. MANISERO:  Yes.  Mr. Kaplan is also an

19     accountant, he comes from the same firm as Mr. Nolan and

20     Mr. Jenkins.

21        Mr. Kaplan opines that CEI's 401k plan was not

22     properly administered.  He bases that opinion based on

23     documentation that was provided to him that when we sat

24     down for his deposition became patently obvious was

25     insufficient documentation.  I was able to show him

1  documentation that he accused us of not maintaining that

2  was actually produced to us in the plaintiffs'

3  production.  His opinion is not supported by any

4  evidence, in fact it's refuted by the documents and by

5  the deposition testimony.  I would submit to you that it

6  is a completely unhelpful report and should be stricken.

7         MR. KROCKMALNIC:  I'll address that point

8  first, your Honor.

9         Respectfully, your Honor, that is quite simply

10 not true.  Mr. Kaplan's report opines upon four

11 principal ways in which Anchin mishandled the

12 administration of the CEI 401k plan.  Those four ways

13 are by improper documentary evidence, by failing to

14 monitor contribution limits of the plan, which is

15 specifically to say whether or not the plan was

16 so-called "top heavy" and whether or not the required

17 nondiscrimination testing, the ADP and the ACP -- please

18 don't test me on what they are, I don't know right now,

19 whether those tests were met.  Whether improper

20 distributions from the plan were made.  He sees from the

21 documents that they were.  And whether or not CEI

22 mishandled forfeiture accounts relating to the 401k

23 plan.

24        Quite simply, your Honor, at Mr. Kaplan's

25 deposition, Mr. Manisero was there and I was there as

1    well.  Mr. Kaplan was unequivocally shown some documents
2    that he did not recall seeing previously and that he did
3    not take into account when formulating his opinion.
4    Those documents pertain to precisely one of those four
5    categories that he opined that Anchin mismanaged CEI's
6    401k plan.  That is the first category predictably with
7    respect to poor document maintenance.
8              He was questioned at his deposition by
9    Mr. Manisero as to whether, now having seen those
10   documents, his opinion would change.  Mr. Kaplan said
11   they would not.  His opinion did not change at all with
12   respect to the other three situations or ways in which
13   he said that the plan was mismanaged, but simply because
14   those missing documents had nothing to do with that.  So
15   respectfully, your Honor, when defendants stand up and
16   say that his report is rendered meaningless because
17   Mr. Manisero showed him a stack of documents, um, we
18   respectfully disagree.
19             MR. MANISERO:  In his report, on Page 3, he
20   states:  "First, defendants' records with respect to
21   both plan documentation and plan administration are not
22   consistent with the records generally maintained by the
23   recordkeepers of the qualified retirement plans."
24   Mr. Kaplan explained that the documents that were
25   provided to him to support his opinions were documents

1    that were provided at the time that the business

2    management relationship between Anchin was terminated

3    and CBIZ was being hired as Ms. Cornwell's new

4    accountants.

5           He specifically says in his report here:  "For

6    example, defendants did not maintain payroll registers."

7    The documents that I was able to show Mr. Kaplan at his

8    deposition were payroll registers that were provided by

9    Anchin to the plaintiffs at the termination of their

10   relationship and which were produced back to us with

11   their plaintiffs' own Bates numbers on them, stacks of

12   documents, your Honor, that are probably 8 to 12 inches

13   high, per exhibit, per year.

14          Because Mr. Kaplan's opinions, and other

15   opinions, are likewise built upon his not being provided

16   with a full set of documentation, documentation that

17   existed in plaintiffs' own hands, then I would submit to

18   you that all of his opinions are unreliable.

19          MR. KROCKMALNIC:  Your Honor, irrespective

20   of how many inches high the stack of documents was,

21   these payroll registers quite simply, Mr. Kaplan

22   testified at his depositions, would only go to the first

23   of four points, they have nothing do with the failure to

24   monitor the plaintiff's contributions, they have nothing

25   to do with making or not making improper distributions

29

 1    from the plaintiff, and they have nothing to do with

 2    mishandling the forfeiture account related to that

 3    plan.

 4            So, yes, it was a very high stack of documents,

 5    there's no dispute about that, your Honor, but they

 6    quite simply had nothing to do with the bulk of the

 7    opinions rendered by Mr. Kaplan in his report.  And

 8    moreover, your Honor, Mr. Kaplan clearly at trial will

 9    be testifying based upon the evidence that actually

10    comes into this case.  It seems difficult for me to

11    understand, your Honor, at this juncture how your Honor

12    or anyone could rule as to the sufficiency of the

13    evidentiary underpinning of Mr. Kaplan's opinion without

14    taking testimony.

15            THE COURT:  Um, I'm going to reserve on

16    this one.  I'm going to look a little more closely at

17    his deposition testimony.

18            (Pause.)

19            THE COURT:  I guess that brings us to

20    Mr. Macknin.

21            MR. MANISERO:  Yes, your Honor,

22    Mr. Macknin.  Mr. Macknin is an insurance professional.

23    Mr. Macknin has offered an opinion that the defendants

24    breached their duties, again their professional duties

25    and their fiduciary responsibilities, and we submit to

1   you that he has no basis to opine about fiduciary

2   responsibilities.  His opinion is that the defendants

3   should have ensured that Mr. Osgood was covered by a $5

4   million professional liability policy and that by virtue

5   of not securing that policy, the defendants caused the

6   plaintiffs to suffer $4,950,000 worth of damage because

7   they would collect beyond the policy.

8           Apart from the fact that Mr. Macknin doesn't

9   establish a standard of care for a business concierge

10  manager, um, but instead is speaking about somebody who

11  is an insurance professional, I submit to you that his

12  opinion is lacking because in order for that insurance

13  policy, had it existed, to have paid its limits,

14  somebody would have had to establish that Mr. Osgood was

15  negligent.  Nowhere in the record of this case is there

16  any professional who opines that Mr. Osgood is

17  negligent.

18          In fact, if you look at Mr. Macknin's report,

19  he states:  "The risk that those engaged in construction

20  project are negligent or otherwise fail to meet their

21  own standards of care."  He identifies that as the risk

22  that would be covered by this policy.  Again he was

23  unable to opine whether Mr. Osgood was negligent and

24  nobody else has.  So on that basis that opinion is

25  absolutely unhelpful.

31

1              MR. KROCKMALNIC:   A few points, if I may,

2     your Honor?

3              First with respect to the question of standard

4     of care and what standard of care attaches to the

5     concierge business managers, I would refer the Court to

6     two excerpts from depositions, the first is from Frank

7     Skitino, the managing partner of Anchin, Block & Anchin,

8     in which he testified that concierge business

9     management, quote, "goes beyond financial aspects and

10    basically handles every aspect of the person's world,"

11    end quote, and that is Skitino's deposition, Page 19,

12    Lines 14 to 21.

13             Mr. Snapper testified that the role of the

14    concierge business manager was not, quote, unquote,

15    "definable" and not, quote, "regulated."  He testified

16    that the service that Anchin provided or those of

17    concierge business managers were, quote, "not strictly

18    handling non" -- "handling not strictly accounting

19    issues," end quote, and, quote, "helping whatever types

20    of things they may need."  That's the Snapper deposition

21    transcript, Page 222, Line 20, through 223, Line 5.

22             That's with respect to the view that it's

23    possible that Anchin could have assumed as concierge

24    business managers.  Let's look at what Anchin actually

25    did assume with respect to concierge business managers.

1           The engagement letter, the operative engagement

2    letter -- again there's no dispute that that's the

3    operative one, from 2004, which is attached as Exhibit 8

4    to our opposition, our omnibus opposition:  "Defendants

5    represent that they would," quote, "review all

6    insurance, both business and personal," end quote, and

7    that, quote, "their review would include full analysis

8    and recommendations in order to maximize benefits at the

9    lowest possible cost," end quote.

10          We submit, your Honor, that it is extremely

11   clear that Anchin took on the duties of making sure that

12   plaintiffs are adequately insured, as Mr. Skitino would

13   put it, "in every aspect of their work."  So what

14   Mr. Macknin did, we suggest, is simply say, "Okay, what"

15   -- "If you are going to assume the obligation of making

16   sure that plaintiffs are adequately assumed, let's see

17   what you did, did you in fact do that or did you not do

18   that?"  Now, I think that's with respect to the first

19   point.

20          I think, your Honor, it's a bit of smoke and

21   mirrors here because, while I understand defendants

22   might not want to bring this up, there's no dispute in

23   this case that defendants actually thought that

24   professional liability insurance, the very insurance

25   that Mr. Macknin testified that Anchin should have had

1   in place, defendants thought it was in place.

2   Mr. Snapper testified at his deposition that he

3   believed, quote:  "There was insurance in place to

4   protect plaintiffs in the event that Bernie,"

5   Mr. Osgood, "negligently performed his job causing

6   injury to the property in the form of decreased property

7   value," end quote.  That's the Snapper transcript, Page

8   756, Lines 17 through 23.

9        Mr. Yohalem, the former, now retired partner

10  and chair or head of the business management unit at

11  Anchin, testified at his deposition that he expected

12  that professional liability insurance would be in

13  place.  The question:  "If you have a professional

14  performing design and construction work, would you

15  normally expect the professional to have insurance in

16  place in case he performs his function negligently?"

17  Answer:  "Yes."  That's the Yohalem transcript, Page

18  304, Line 22, through Page 305, Line 3.

19        Bernie Osgood, the general constructor,

20  testified that he believed it was Anchin's

21  responsibility to make sure that he, Mr. Osgood, had

22  professional liability insurance in place in case the

23  project was built on a, quote, "design-build basis," in

24  which it unequivocally was for at least part of it.  The

25  Osgood transcript.  There he says, the question:  "If

34

1  it's a design-build contract, who is it that has the

2  professional liability insurance coverage -- that has to

3  have the professional liability insurance coverage to

4  protect the owner?"  Answer:  "I would expect the owner

5  to make sure that I did," Osgood, 274, Line 20, through

6  275, Line 7.

7           So, your Honor, respectfully we think that this

8  is -- it's smoke and mirrors.  There's no question.

9  They believed that they had this responsibility, they

10 believed that they executed on this responsibility, and

11 they unequivocally assumed the responsibility, so I'm

12 not sure what we're talking about here.

13          MR. MANISERO:  I think we have another

14 factual dispute here.

15          First of all, we don't know here and we

16 probably will never know whether or not Mr. Osgood did

17 in fact have insurance and the reason being is the

18 plaintiffs and their counsel, although they threatened

19 to sue Mr. Osgood, they never did.  There was some

20 exchange with insurance that was in place with

21 Mr. Osgood.  That was not pursued.  So we don't know.

22          Mr. Snapper didn't believe that there was

23 insurance in place, he believed, and I think he properly

24 understood that Mr. Osgood had builders -- builders own

25 risk insurance that was in place, which is different

1    from professional liability insurance.

2            Finally, with respect to the issue of procuring

3    professional liability insurance, Anchin went and they

4    consulted with the insurance brokers who handled the

5    insurance placements for Ms. Cornwell's and CEI's

6    businesses and the record establishes that those experts

7    did not recommend the purchase of professional liability

8    insurance covering Mr. Osgood.

9            And again I point out that nowhere on the

10   record of this case, no expert, no finding, no

11   conclusion, nobody has ever established or will be able

12   to establish that Mr. Osgood was negligent and that if

13   this insurance was in place, that it would have been

14   recovered.

15            MR. KROCKMALNIC:  Your Honor, I'll start

16   from the end, if I may?

17            With respect to that last point, Mr. Macknin

18   unequivocally testified at his deposition, taken by

19   Mr. Manisero, that a requirement of a showing that

20   Mr. Osgood was negligent is not at all necessary for

21   showing damages with respect to insurance.  And that

22   quite simply, your Honor, is because oftentimes -- and

23   Mr. Macknin testified that in this case it likely would

24   have been the case, that insurance companies have a duty

25   not just only to indemnify, but also to defend against

1    suits, to defend against investigations.

2          And so Mr. Manisero is correct that we looked

3    into whether or not Mr. Osgood had insurance in this

4    case.  We determined that Mr. Osgood did not have

5    insurance.  Had we determined that he had, it's

6    possible, although I can't say it's likely that we would

7    have actually gone after Mr. Osgood, at which point

8    Mr. Macknin submits that in all likelihood the insurance

9    company would -- their duty to defend would have kicked

10   in.

11         So again, respectfully, I think defendants are

12   missing the point with respect to this case within the

13   case which you see them reference so frequently in their

14   briefing that we need to first establish Mr. Osgood's

15   liability with respect to damages.

16         Separate from that, your Honor, I do submit

17   that there is ample evidence, and we intend to show it

18   at trial, that Mr. Osgood was in fact negligent at a

19   minimum with respect to many of the actions taken and

20   that damages would have accrued as a result not just for

21   the duty to defend, but also the duty to indemnify.

22         The second point, your Honor, is with respect

23   to the insurance brokers that Mr. Manisero referenced.

24         The insurance brokers that Mr. Snapper engaged

25   at SKCG, and Mr. Ron Baskin at SKCG, six times asked

1  Evan Snapper for what's called a "Course of

2  Construction" document.  It is a document that has to be

3  completed that gives the insurance brokers -- that gives

4  the insurers a heads-up as to what exactly is going on

5  in this project.  "Let's see what's going on so we can

6  properly make sure you have the right coverage."  Six

7  times.  And this is undisputed documentary evidence,

8  your Honor, that we most certainly will be showing at

9  trial, they sought out this information from Mr. Snapper

10  and six times they were stonewalled.

11       And so with respect to the argument that the

12  insurance brokers recommended a certain level of

13  insurance, so that's all you need to know, no, that's

14  not the end of the story.  And there's active negligence

15  at a minimum, we submit, on behalf of defendants, for

16  not allowing the insurance brokers to actually do their

17  job.

18       And then ending where Mr. Manisero started.

19  Yes, as you can tell, many of these facts are very much

20  in dispute.  This is not the forum to resolve these

21  facts.  Let the jury hear the facts, your Honor, and

22  Mr. Macknin will base his expert opinion, his expert

23  testimony at trial on those facts.

24            THE COURT:  Okay.  I think this is the same

25  problem as with Erickson, that is, the question is not,

1    strictly speaking, whether the defendants had a duty

2    with respect to insurance, the precise question is

3    whether this witness can say they did, um, and I think

4    he's just again in the wrong field, he's an insurance

5    professional, he's not in the same position as, for

6    example, Nolan, um, to give an opinion about the duties

7    of a concierge business manager.  I think that's the

8    fundamental problem with it.

9            Also is the question of whether there's a

10   contractually-assumed-to-be duty to obtain insurance,

11   which presents an entirely different question as well.

12   But this is a question about the testimony of the

13   witness and I think the objection is sound and I will

14   grant this motion as well.

15               (Pause.)

16               THE COURT:  Now, let's see.

17               (Pause.)

18               MR. MANISERO:  Ms. Newberg has been

19   Ms. Cornwell's literary agent for many, many years.

20   She, in fact during this period of time that Anchin was

21   the concierge business manager, her company was paid

22   something in the order of $10 million.  Um, Ms. Newberg

23   has offered an opinion, not in a traditional expert

24   witness format, her report is not in a traditional

25   expert witness format, her opinion is based upon her

39

1    however-many years of being a literary agent

2    representing successful business people and specifically

3    her many years of representing Patricia Cornwell.  She's

4    been offered in essence in the category of a treating-

5    physician-type expert witness and we submit to you that

6    that's not appropriate.

7              Also, her opinions are completely unhelpful and

8    unreliable because she bases her opinions on some

9    assumptions that are not supported by the record.  She

10   also makes conclusions that are not factually supported

11   by the record.

12             For instance, a very big issue in this case is

13   whether in 2006, when Ms. Cornwell missed a, quote,

14   "deadline" for one of her Scarpetta books, um, which

15   there is a -- a big portion of this trial is going to be

16   dedicated to that particular claim, um, Ms. Newberg

17   opines that as a result of her missing that book

18   deadline, in essence what she's done is missed a year's

19   worth of royalty revenue, and for some reason that

20   belongs, based on what Patricia Cornwell told her, that

21   responsibility rests with the defendants.

22             Ms. Newberg may be a fact witness about certain

23   of these issues because she is involved in negotiating

24   royalty contracts.  In fact she negotiated a royalty

25   contract for two more Scarpetta books that was signed

1   right at the time that the book that was due was about

2   to be due, um, for a royalty revenue that was in line

3   with the prior contracts, but she claims that because

4   the book deadline was missed, um, it put her in a

5   situation where future royalty streams were going to be

6   lessened.

7        We submit to you that Ms. Newberg's opinions

8   with respect to these matters are completely ipse dixit,

9   are not expert opinions, and should be stricken.

10            THE COURT:  All right.

11            MR. WOLOSZ:  Thank you, your Honor.

12        With respect to the defendants, I think that

13  this motion suggests that Ms. Newberg's opinion is kind

14  of a bigger deal than it is.  She is primarily a fact

15  witness, and I think we agree on that, but just to be

16  clear, there is no motion to exclude her testimony

17  completely.  But in addition to testifying about the

18  facts, because she's been Ms. Cornwell's literary agent

19  for so long, there is an opinion that we have offered

20  her to testify about and that involves the effect that,

21  um, missing a book deadline had on the stream of income,

22  the advances that were coming from these book deals.

23        It's -- essentially what she's going to testify

24  to is akin to sort of an evaluation-type thing.  I mean,

25  she's an expert in the publishing field and she's simply

1  going to say, "Look, I was there, I observed it, I saw

2  what happened, um, I have a lot of experience in this

3  area, and she missed a deadline and then we went to

4  negotiate, she got less money."  And she offers a couple

5  of reasons based on her experience and in deposition she

6  referenced other examples as to why this is not a

7  remarkable, um, frankly outcome and why she believes

8  that the missed book deadline is a factor in the

9  reduced, um -- in the reduced income.

10       The reason I say it's sort of like a valuation

11  expert is because it's not really that she's giving, um,

12  you know, a sort of opinion on their state of mind,

13  which is what I think the defendants are trying to

14  suggest, that she's going some opinion on why someone

15  did what they did, it's really more of a valuation-type

16  thing.  She works for this industry, it's fair to ask

17  her sort of questions around these advances that

18  Ms. Cornwell got, and it's fair to ask her, based on the

19  situation that she observed firsthand, whether it had an

20  impact on anything.

21       The issue with respect to the report, um, I

22  think we just don't understand it.  It's just, under the

23  rule, um, a more fulsome report is not required.  As I'm

24  sure the Court knows, a couple of years ago the rule was

25  changed and now there are two different versions of

1    reports that are required and she doesn't fit in the

2    category where a full report is required, along with her

3    CV and all these other things, because she's not

4    assuming facts and then rendering an opinion based on

5    assumed facts, she's testifying and then giving this

6    opinion at the end, um, with respect to that last piece

7    of it.

8           So for all those reasons, um, we would suggest,

9    your Honor, that it is not appropriate to strike her

10   opinion.

11          And the last thing I'll say is that, you know,

12   a point we've heard a couple of times, and we'll hear it

13   again, is that she makes assumptions or reaches

14   conclusions that are not supported by the facts.  Again,

15   once the evidence is presented, if she offers an opinion

16   that's not supported by the facts, first of all, I think

17   the defendants will renew their objection.  Secondly,

18   even if she offers the testimony, they'll be able to

19   explore it on cross-examination.  It's not appropriate,

20   we would suggest, to strike her completely based on that

21   point.

22               MR. MANISERO:  Just -- I simply point out

23   that Ms. Newberg was asked to assume that the book

24   deadline was missed at Anchin's fault.

25               THE COURT:  Okay.  Well, I agree that it

1    appears that she will be both a fact witness and perhaps

2    an opinion witness, um, and there may be some opinions

3    that won't be supported by her testimony, we can deal

4    with that at trial, but as a general exclusion, um, the

5    motion is denied.

6          I think that's all the defense motions directed

7    at experts.  There's an expert motion that plaintiffs

8    have with respect to the defense expert.

9          Who's arguing that?

10          MR. WOLOSZ:  Yes, your Honor.

11          Your Honor, this is our motion with respect to

12   the, um, the expert that the defendants have noticed,

13   Vincent Love.

14          The main problems, the two main problems with

15   Mr. Love's 80-page expert report are that, Number 1,

16   much of his testimony involves factual disputes.  In

17   some cases just stating an opinion on which way he

18   thinks the facts should come out based on whatever the

19   extent of the record is that he looked at.  The other

20   problem is that he testifies as to everything, all

21   fields.

22          He has experience, he's a CPA, he's a certified

23   fraud examiner and a certified bank auditor, and he also

24   has ethics experience relating to the accounting field,

25   yet he testifies with respect to concierge business

44

1    management, investment management, real estate,

2    construction management, publishing, insurance, and

3    reputational damages.  Um, and I would suggest, based on

4    the Court's rulings thus far today, there's a real

5    problem when, um, a witness like this, who has specific

6    expertise with respect to accounting, talks about all

7    these various fields.

8           He has no qualifications in these fields.  They

9    say, in their opposition brief, that that's really just

10   a point for cross-examination, but frankly, your Honor,

11   it's over the top when it's this extensive, um, and he

12   offers opinions in so many areas.

13          There are a few specific things that are wrong

14   with the report.  The first is that, again, Mr. Love,

15   and this is consistent with the theme that we hear

16   throughout these motions, he's applying -- he's

17   attempting to apply only an accounting standard of

18   care.  He disclaims any knowledge of the fiduciary

19   standard and says he's not going to apply it even

20   though, in their opposition brief, they at least are

21   starting to, I think, recognize that for some things

22   there is a fiduciary duty standard.  And I say I think

23   they're starting to recognize it because we said a

24   number of times in their papers that Mr. Snapper

25   admitted in connection with -- you know, he has his

1    guilty plea and then he has a proceeding before the

2    Board of Bar Overseers with respect to the Department of

3    Justice investigation, which I think we'll be talking

4    about a bit later, he has admitted that he owed a

5    fiduciary duty.  And, you know, perhaps recognizing that

6    they can't completely run away from that, um, first, the

7    -- you know, the defense tries to stick with this

8    accounting standard, then they say, "Well, if there's a

9    fiduciary duty, it would only apply to certain things."

10   In any event, this witness refuses to opine on a

11   fiduciary duty standard, which we say applies.

12          So we would suggest that it's going to make it

13   very confusing for the jury, because if he's allowed to

14   testify only as to the accounting standard, they're

15   going to hear all about whether somebody complied with

16   the accounting standard when that's not the operative

17   standard that they're going to be asked to apply, we

18   believe, based on the other facts that they'll find.

19          They cite a number of cases in their

20   opposition, they go on for quite a few pages just to

21   make the unremarkable proposition that a normal

22   accountant-client relationship is not a fiduciary

23   relationship, but that's beside the point because what

24   none of those cases say is none of them says it cannot

25   rise to the level of a fiduciary-duty relationship.

1          In fact, we cited -- it's an interesting --

2    this article in the CPA journal -- this is Exhibit 5 to

3    our memo of law, um, an author by the name of Dan

4    Goldwasser, who at one point was a co-author with

5    Mr. Love on an article, this man, Dan Goldwasser, wrote

6    an article that was published in the CPA Journal at a

7    time when Mr. Love was on the editorial staff -- I'm

8    sorry, the editorial board, and the article is all about

9    how accountants need to be careful because if they start

10   taking on more responsibilities, then all of a sudden

11   their accounting standard rises to the level of a

12   fiduciary duty.  It's exactly the situation that we have

13   here, yet he's not qualified to and he will not offer

14   any opinions on that fiduciary standard that we think

15   applies.

16          The other challenge that we have to the report

17   -- and, you know, I don't want to go on too long, but

18   it's -- frankly it's frustrating because in 80 pages

19   there's a lot of stuff, um, what the other challenges

20   are -- well, first of all, he usurps the role of the

21   Court by giving an opinion on the meaning of the

22   contract.  He, for example, he looks at the engagement

23   letter and gives an opinion that defendants had no duty

24   to perform due diligence on leases of real property.

25   It's completely outside of his field.  It's also a legal

1    question whether, um, that duty applies.  You know, an

2    expert can't testify on the meaning of a contract.

3           The other issue is that he -- he usurps the

4    role of the jury by making credibility determinations,

5    by giving opinions on plaintiff's state of mind, and by

6    reconstructing the facts.  And again just -- I'll just

7    give one example of each -- your Honor, there's more

8    covered in our papers, but credibility.  This is a quote

9    from his report.  "Why did plaintiff call her sister-in-

10   law to invite her brother and son and then also call her

11   brother to invite him and her sister-in-law and their

12   son?"  He asks this rhetorical question to suggest that

13   perhaps their testimony isn't truthful.

14          As a CPA who purports to be applying an

15   accounting standard, it has nothing to do with anything,

16   and we certainly don't agree that he should be allowed

17   to testify consistent with that manner or in any of

18   other examples that we've given.

19          Here's an example of how he discusses state of

20   mind.  This is a quote.  "Since the Purchase & Sale

21   Agreement was executed three days later, on January

22   31st, 2006, it appears that the plaintiffs were aware of

23   and approved the purchase of the renaissance unit."

24          I mean, as a fact witness, it's not that it's

25   -- that it will draw an immediate objection.  Um, an

48

1    expert's allowed to offer an opinion, but they're not

2    supposed to be able to offer an opinion on what someone

3    knew.

4         And then with respect to the factual

5    reconstruction or sort of the factual determinations,

6    um, here he says -- and this is on Page 27.  Um, I

7    wasn't giving the earlier pages.  I can go back if the

8    Court wants the pages references.  This is on Page 27 of

9    his report.

10        "As this documentation and testimony

11   illustrates, the plaintiffs continued to maintain

12   control over the scope of the project and were kept

13   reasonably informed regarding the status of

14   completion."

15        So now he's opining on the extent to which the

16   plaintiffs were adequately notified about this project.

17   And again he's a CPA who insists that he's only applying

18   accounting standards.  This 80-page report really is

19   over the top.

20        The point of the rule is to allow somebody to

21   come in even though they don't have factual information

22   to offer because their expertise is helpful.  And as the

23   Court knows, they come in and they offer expertise in

24   their area.  It's not a license to bring somebody in to

25   review the whole case and to just give opinions after

1    opinions about everything.  And that's why we believe

2    that the report should be stricken.

3              MR. MANISERO:  Your Honor, I think that we

4    have addressed all of these points pretty adequately in

5    our opposition to their motion, but I do want to make a

6    couple of additional points.

7              First of all, getting back to the notion of

8    fiduciary responsibility for a minute.

9              The plaintiffs would like this court to apply a

10   rule that says "once a fiduciary duty attaches with

11   respect to some aspect of the business manager services,

12   it now pervades every other aspect and everything that

13   they do has to be held by that fiduciary

14   responsibility."  I submit to you, your Honor, the law

15   does not provide that.  And the law actually provides

16   that, as respects accountants, there are only limited

17   instances where a fiduciary duty attaches.  The general

18   rule is that they are not fiduciaries.  I don't think

19   that if they take on a role with respect to a particular

20   task where they may actually take on a fiduciary

21   responsibility, that necessarily means that when they go

22   back and they pay a bill or they prepare a tax return,

23   um, that they have a fiduciary responsibility there that

24   heretofore did not exist.  And that's what the

25   plaintiffs are trying to apply here, your Honor.

1          I submit that whether a fiduciary

2    responsibility exists with respect to Anchin's services,

3    the Court is going to have to evaluate those services

4    and see whether those specific services are such that a

5    fiduciary responsibility does apply.

6              Now, with respect to Mr. Love.  There's no

7    doubt that Mr. Love is a very qualified CPA.  He had

8    been providing expert witness testimony in many cases

9    for many years.  He's been a CPA for more than 40

10   years.  He's been with large firms.  He's been with

11   small firms.  He's been on the New York State Ethics,

12   um, Professional Ethics Committee.  He's been on the

13   AICPA, the Professional Ethics Committee.  He has spent

14   a lot of his time evaluating CPA behavior to see whether

15   it comports with the rules and regulations and the

16   standards.  That's what he does and that's exactly what

17   he did here.  He took a look at the record that was

18   developed during discovery and he offered his opinions

19   whether or not the accountants comported themselves in

20   accordance with the standards.  Where he did not have

21   evidence in the record to support an opinion, he

22   actually states that he doesn't have the ability to do

23   so.  It's clear in his report.  I submit to you that

24   Mr. Love's report is exactly the kind of report that

25   this court would encourage.

51

1              MR. WOLOSZ:  Just briefly, your Honor.

2          We will argue that the fiduciary-duty standard

3    applies far more broadly.  We made the point in our

4    papers that it extends to the scope of the agency and

5    that is our position here.

6          It arises both from the concierge business

7    management relationship, but it also arises because

8    Mr. Snapper was an officer of several of the companies

9    that were formed that owned, um, the various properties

10   and things like that.  And so the fiduciary duty comes

11   from a number of different places.

12         What's interesting about Mr. Love is that he

13   never says, in his report, that there cannot be a

14   fiduciary duty here, he simply says, "That's not what

15   I'm here to discuss."  And so I would suggest that even

16   Mr. Love's own testimony does not dispute our point that

17   it's a fiduciary duty standard, he just says, "I'm not

18   talking about that, that may or may not apply, it's not

19   for me to say.  I'm applying this standard," and he goes

20   on to apply it.  And again, the only other point I'll

21   make is that that is a separate question from all the

22   other stuff that he sort of covers, because even if he

23   could testify as to the accountant standard, he goes

24   well beyond it by addressing the other topics.

25              THE COURT:  Well, the plaintiffs' claims

52

1  include of course a theory of a breach of fiduciary

2  duty, but include more than that, they include breach of

3  contract obligations and a breach of professional duties

4  of care as well.  So I think looking at this simply as a

5  fiduciary duty claim is too simple.  And certainly, um,

6  this witness or any other wouldn't be allowed to opine

7  -- as you've argued a number of times, would be allowed

8  to opine as to what the law is, that that would be

9  beyond the scope.

10         It seems to me that there are some things that

11  Mr. Love can properly testify to that are in his

12  report.  There may also be some that he cannot.  I don't

13  think it's useful to try to pull those apart at this

14  stage of the proceedings.  It will be much sounder and

15  more practical to do that as he testifies.

16         So I'm going to deny the motion to the extent

17  it seeks to exclude his testimony in its entirety or to

18  strike his report.  I tend to think that he may not be

19  able to testify to everything he has in his report, but

20  we'll see how that goes at trial.

21         So for the time being, as a pretrial matter and

22  as a wholesale matter, um, the motion to exclude his

23  testimony is denied.

24              (Pause.)

25              THE COURT:  Now, I don't want to address

53

1    all of the other evidentiary exclusion motions, but

2    there are a couple that I do want to, and maybe after

3    we've done that, if I haven't touched on the ones you

4    think are most important, you can suggest that we ought

5    to deal with some of the others.

6          But let me ask you first about the defendants'

7    motion to exclude evidence and testimony concerning

8    Patricia Cornwell's bipolar disorder.

9          And the question I had on that is that, you

10   know, this is the defendants' motion, obviously, um, and

11   I'm not sure of the relevance -- well, maybe it's a

12   question for the plaintiff, I guess.  I'm not sure of

13   the relevance of the evidence.  In other words, is it

14   the plaintiffs' contention that the duty of care or the

15   standard of behavior is different as to a client who has

16   bipolar disorder as opposed to somebody who doesn't?

17         MR. WOLOSZ:  The Court has asked the

18   question in a very interesting way, because I think the

19   answer is "yes," but let me explain why.

20         As a concierge business manager, they took over

21   running Ms. Cornwell's life.  She informed them that she

22   had a mood disorder and they were aware, in fact they

23   admitted in their answer, they were aware that she had

24   so informed them.  That mood disorder is part of what

25   led to the things that they needed to do for her.  Find

54

1    a quiet work space because of, you know, certain mood

2    swings that she suffered as a result of the disorder.

3    Um, the mere fact that it would have been a distraction

4    to her to have to handle these things, um, because of

5    the disorder.

6          So it can't be separated because their

7    standard, we argue in this case, took into account that

8    this is the kind of person she was, and so that's what

9    they needed to do for her.

10         THE COURT:  Well, I guess that's the

11   question.  Is that your proposition that, um, this is a

12   sort of, um, client-relations version of the *Findler*

13   rule of an earlier time?  In other words, if you have a

14   client with a prickly personality, you would have to

15   behave a certain way.  If you have an easy-going don't-

16   really-care client, you don't have to behave that way.

17         Is that what's going on here?

18         MR. WOLOSZ:  I think that's absolutely

19   right.  I mean, it's only part of the equation, but it's

20   an important part of the equation because, we would say,

21   it's part of why Ms. Cornwell needed to have folks to

22   run this stuff for her and why, you know, this issue,

23   which permeates to a number of the events that we'll be

24   discussing at trial, this issue of her having a quiet

25   place to work, is so important.  It's what they knew,

55

```
 1    it's partly related to this mood disorder, and, more
 2    importantly, they knew about it, it was discussed and
 3    understood as, you know, sort of a factor.  And again,
 4    you know, as they admitted in their answer, they say
 5    they admit that she openly acknowledges having been
 6    diagnosed with a mood disorder and at a certain point
 7    during their professional relationship they became aware
 8    of Ms. Cornwell's bipolar disorder.
 9            Um, the other reason why it's so important is
10    that we believe they are going to -- the defendants are
11    going to put up sort of a -- if the Court can excuse the
12    expression, but it's Ms. Lukey's, a "diva defense," um,
13    that, you know, they're going to say, "Well, she's
14    mercurial and she was sort of acting in an erratic way,"
15    and it's going to be necessary for the plaintiffs to be
16    able to respond to that especially since it's -- um,
17    simply with respect to this issue, which they knew
18    about.  So for all those reasons we do think it's
19    relevant.
20            They argue, in their rely, that there's no
21    medical expert, but again it's beside the point because
22    she said it and they knew about it and that's why we say
23    it should have been factored in, which is why we think
24    it needs to come out.
25                    THE COURT:  Mr. Campbell.
```

56

1              MR. CAMPBELL:  Thank you, your Honor.  I

2    picked the right order to divide these motions up.

3              Um, there's no expert of any type about this.

4    The defendants, my clients, may have known that she had

5    bipolar disorder, but they knew a lot of things about

6    Ms. Cornwell.  That -- the plaintiff now wants to

7    suggest that because we knew that fact, that we can read

8    on the internet, that that has implications about how we

9    should deal with her, about her response to things,

10   about the level of her, um, condition, and to suggest

11   that -- they're calling it "bipolar," I just heard "mood

12   disorder," I didn't even hear "bipolar."

13             If you look at the first footnote of many

14   footnotes in these papers, on this motion, it goes on to

15   describe what it is, gives kind of a diagnosis of what

16   that means, gives a lot of stuff about what this might

17   imply, but the bottom line, Judge, is that there is no

18   evidence that she has bipolar disorder in the sense that

19   there is no medical testimony.  If this was part of it,

20   it should have been part of the automatic disclosure.

21   Sure we knew about it in the answer, we said, "yes," we

22   knew about it.  But there's no medical evidence, there's

23   no medical evidence of the level of her condition,

24   there's no medical evidence of what that means for

25   Ms. Cornwell, and whether that has anything to do with

 1    anything about this case other than it could create

 2    perhaps an explanation for everything about the case

 3    should the plaintiff want to do that.

 4           And there's actually case law, and I believe

 5    your Honor actually ruled on it, it was a bankruptcy

 6    proceeding or something, where there was an absence of

 7    medical testimony to support this, what it means.

 8    That's one part of it.  The question that you started

 9    with was another part of it.

10           Not one of these multiple experts that the

11    plaintiffs have identified and are going to bring to the

12    Court have said anything about bipolar disorder, that it

13    should create a heightened response for the defendants

14    here.  There's nothing to suggest what that is, what we

15    should have done differently, and the like.  It's

16    irrelevant to the case, um, without any backing, um, any

17    expert evidence or any evidence at all about what it's

18    about.

19           And I think it's an issue that truly is unduly

20    prejudicial, unfairly prejudicial, because the word

21    "bipolar disorder," or the phrase "mood disorder," might

22    mean something to somebody, mean something to somebody

23    else on the jury, and yet a third thing to Ms. Cornwell

24    as a witness.  Without a definition of what it means for

25    her, how it applies to the case, how it applies to the

58

1   standard of care, it is truly and indeed unfairly

2   prejudicial and should be excluded.

3                THE COURT:  All right.

4                MR. WOLOSZ:  This is not about evoking

5   sympathy, it's central to the relationship because it

6   explains why Ms. Cornwell was seeking the services of

7   Mr. Snapper and of Anchin to run so many aspects of her

8   life.  Mr. Krockmalnic just reminded me of a fairly

9   simple example of how we say this applies.

10               If he's my concierge business manager and if I

11   say to him, "Go get me a piece of fruit," and he comes

12   back and he gives me an orange, he's probably complied

13   with everything that I said.  If I say to him, "Go get

14   me a piece of fruit, but I hate oranges," now it may be

15   true that I hate oranges, it may be false, there may be

16   experts, there may be everybody to testify on what I

17   think about oranges, but it's besides the point.  If I

18   say to him, "Go get me a piece of fruit" and I hate

19   oranges, he'd probably better not come back with an

20   orange.  That's the simple point that we're making

21   here.

22               The fact that she has this mood disorder that

23   is so centrally wrapped up in the very tasks that she

24   was asking them not just to do, not just "Go out and get

25   me this," "Go out and get me that," like I just used as

59

1      an example, but these are concierge business managers,

2      they're expected to know and take over, they're expected

3      to handle these things for her.  They had access to her

4      bank accounts.  She didn't.  They were making these

5      decisions.  They were able to purchase properties by

6      signing her name.  Um, that's the reason why this

7      central fact is so crucial and it needs to be part of

8      the story in order to fully understand it.

9                  MR. CAMPBELL:  One last point.  So much has

10     been made of that November 22nd, 1994 proposal from

11     Mr. Yohalem and Mr. Snapper when he was with the prior

12     company.  There's nothing in there about, "Oh, and by

13     the way, this condition exists and therefore the scope

14     of the relationship or the proposal won't make any

15     difference."  So it's not fundamental to anything in

16     this case, it just happens to be something, um, a fact

17     about Ms. Cornwell that should be excluded.  Thank you.

18                  THE COURT:  Okay.  You both made some

19     interesting points and I want to think about this one a

20     little further.  I'll reserve on this one.

21          Okay.  Let's see.

22          (Pause.)

23                  THE COURT:  The New York tax issue about

24     the helicopter is out of the case, is that right?

25                  MR. WOLOSZ:  It is, your Honor.

1          THE COURT:  Well, what I'm not clear about

2   is there's a motion about the helicopter sale.  Is that

3   a distinct issue?

4          MR. CAMPBELL:  It is, Judge.

5          THE COURT:  Well, let me hear about that

6   then.

7          MR. CAMPBELL:  The helicopter sale has to

8   do with a commission on the sale of a helicopter.  The

9   helicopter was going to be sold for $3.1 million.

10  Mr. Snapper engaged a broker who, um, in order to get

11  the business, um, I fairly read the document involved,

12  said, "Well, I'd like your business, I'd work for 50,

13  I'd work for $100,000, um, to get involved with this."

14  There was nothing specific about the helicopter.

15         In any event, the claim is that the commission

16  that the gentleman received for the sale of the

17  helicopter was, um, too much.  It turned out to be

18  $140,000, um, and it's -- the allegation is that, um,

19  Mr. Snapper paid too much.  It's just not supported by

20  the evidence, Judge.  And I rely upon the briefing that

21  we've submitted.

22         MR. KROCKMALNIC:  Thank you, your Honor.

23         If I can briefly walk the Court through

24  plaintiffs' allegations here.

25         It is not simply that the helicopter broker, as

61

1    Mr. Campbell has said, made too much, it's principally

2    that he made anything at all.  And secondarily, let me

3    refresh your recollection on what our allegations are.

4          Ms. Cornwell has a Bell 427 helicopter.  She

5    customized it, put her Scarpetta logo on the side, and

6    she, um, decided, upon Mr. Snapper's advice, that --

7    with the help of Mr. Snapper's advice, that she'd better

8    get rid of it because she learned from Mr. Snapper that,

9    um, the price of these helicopters were depreciating and

10   that she should get rid of it soon.  Um, it turns out

11   that that was not correct and, rather, the price of the

12   helicopter was appreciating.

13         Her helicopter pilot at the time, Mr. Paul

14   Gingrich, offered to assist her in the sale.  He's a

15   professional in the industry.  He offered to help her

16   with the sale.  It's our contention that Mr. Snapper

17   wanted to sideline Mr. Gingrich, wanted to exclude him

18   from the general business dealings of CEI and of

19   Ms. Cornwell.

20         The helicopter -- and it's important and I'll

21   get into this in a little bit, was owned by CEI, and so

22   Mr. Snapper effectively disintermediated Mr. Gingrich,

23   who suggested, "Let me put an ad in a publication where

24   this thing is going to get snapped up, because these

25   things are hot commodities right now."  There's

62

1    testimony and there's evidence suggesting that

2    Mr. Gingrich contacted Bell himself and said, "How are

3    these things doing on the secondary market?" and they

4    said, "They're doing really well."

5           Now, Mr. Snapper did take that advice, he

6    engaged the services of Mr. Tony Alcedo, down in the

7    Dallas area, and Mr. Campbell is correct that

8    Mr. Alcedo, right at the outset, um, testified, or

9    rather put an e-mail directly to Mr. Snapper and said,

10   "I would be thrilled to take a $50,000 commission on the

11   sale of this helicopter."  In fact, Mr. Alcedo ended up

12   taking home a $140,000 commission on that helicopter.

13          So our primary claim is the use of Mr. Alcedo

14   was wholly unnecessary and that he didn't discharge his

15   fiduciary duties, which in this case are undisputed to

16   CEI.  And I say that they're undisputed because on the

17   one hand Mr. Snapper was, at all times relevant with

18   respect to this transaction, the treasurer and the

19   secretary of CEI, he was a corporate officer of the

20   corporation.

21          Secondarily, um, Mr. Snapper sought out

22   Mr. Alcedo, after ignoring Mr. Gingrich, and despite

23   Mr. Alcedo saying, "I'll take $50,000," ended up paying

24   him a $140,000 commission.  All Mr. Snapper cared about,

25   and this is in the testimony, is that CEI recoup the

63

1    original sale price of the helicopter, that they didn't

2    lose money.  He didn't care about any potential upside.

3    He instructed Mr. Alcedo, "I don't care how much you get

4    as long as you get me 3.9.  I need 3.9, $3.9 million."

5            Mr. Alcedo testified at this point -- and the

6    defendants do not dispute this, the defendants, it's in

7    their own motion, say that:  "Mr. Alcedo's commission,

8    was," quote, "the difference between the sale price that

9    Mr. Alcedo negotiated and the price indicated by Snapper

10   that he needed for the sale of the helicopter."  What

11   does "needed" mean?  This is the crux of the argument

12   from our standpoint, your Honor, or the secondary

13   argument.

14           What Mr. Snapper needed was to discharge his

15   fiduciary duties to CEI and to act at a minimum in a

16   nonnegligent fashion to CEI as his officer.  And if

17   there's a market out there, if there's a liquid, or

18   rather an ill-liquid market, I suppose, for high-end

19   helicopters, that these things would be going for $5

20   million, then you need to get more than $3.09 million

21   especially when a helicopter broker is saying, "I would

22   be," quote, "thrilled," end quote, "to take home a

23   $50,000 commission."

24           Mr. Snapper ignored that.  Mr. Alcedo

25   testified, "I think I remember him saying he didn't care

1    if I sold it for $5 million, that as long as he got the

2    3.9 for his client, that anything above that, he would

3    pay me the commission," end quote.  That's a direct

4    quote.

5              Your Honor, we submit that that is a gross

6    breach of Mr. Snapper's fiduciary duties to the

7    corporation that he was an officer of and it is more

8    than ample evidence of negligence on behalf of

9    Mr. Snapper.

10         And I'll rest on the secondary facts for now.  I'm

11   happy to engage them with respect to the involvement of

12   Mr. Ron Rapp, the helicopter broker, and how exactly

13   Mr. Alcedo ended up with $140,000, instead of the 200 or

14   instead of the 50, but I'll leave it there for now.

15              MR. CAMPBELL:  Ron Rapp is a lawyer that

16   represents Ms. Cornwell in aviation issues.  So in terms

17   of fiduciary duties in carrying them out, Mr. Snapper

18   contacted basically an expert in the field to recommend

19   this course of action as opposed to, um, relying upon

20   somebody that Ms. Cornwell was going to

21   ultimately -- it's a motion in limine, Judge, and I

22   don't want to get into disputed facts, but suffices to

23   say that many of the facts that were just recited are

24   disputed.

25              But the fundamental issue here is that a

65

1  commission was owed and he discharges his duty, um, by

2  engaging an expert in aviation, this was a reasonably

3  prudent thing to do, and to, um -- and I'll put it this

4  way.  If the other course of action to engage a

5  helicopter pilot that was part-time for Ms. Cornwell on

6  some terms that are questionable are going to be subject

7  to a lot of evidence and it didn't go -- well, no matter

8  what happened, we would have been challenged for not

9  ending up taking Mr. Rapp's advice.

10             THE COURT:  Okay.  Well, I see your point

11  that there is a dispute, so we'll leave it in the

12  evidence.  The motion to exclude is denied.

13             Um, that sort of, I think, um -- another one on

14  the same general theme is the motion about the

15  friendship with the NetJets representative.  Let me --

16  for oral argument.

17             I think showing a -- a friendship that would

18  perhaps compromise a duty of loyalty is appropriate in

19  the evidence.  As I read what's been presented, though,

20  the suggestion that it was extramarital or sexual goes

21  beyond what is available in the evidence.  So I think

22  you can show it, the plaintiffs, but I think it should

23  be to the -- I guess the best way to put it is leave it

24  at the friendship level without suggesting anything more

25  than that, I think gets you the point.

1          And as to the, um -- what seems to be

2    speculation about other female guests in hotel rooms,

3    um, I think that should be out.

4          Okay.  Let's see.

5               MR. KROCKMALNIC:  Your Honor, could I seek

6    a clarification on that latter point?

7               THE COURT:  Yes.

8               MR. KROCKMALNIC:  Is it the fact of the

9    gender of the guest or is it the mere existence?  And I

10   ask --

11              THE COURT:  It's trivial, it seems to me.

12   It doesn't connect anything, does it?

13              MR. KROCKMALNIC:  If I may be heard,

14   extraordinarily brief, your Honor?

15        Our allegation is it connects because we

16   specifically allege in our complaint that Mr. Snapper

17   charged hotel rooms, at the W Hotel in Manhattan, to the

18   CEI account, and that he used said hotel rooms for

19   personal reasons.  And so we have no intention, your

20   Honor, to be perfectly clear, of arguing anything

21   untoward or sexual.

22              THE COURT:  Do you have any evidence that

23   he did, I mean, in this way, that he had guests?

24              MR. KROCKMALNIC:  We do, your Honor, we

25   have his own deposition testimony to that effect.

1          THE COURT:  Is this -- I guess when I say

2     it's trivial, it strikes me as a little bit like driving

3     somebody someplace in the company car.  I mean that

4     might technically be a violation, but does it amount to

5     much in the context of this case?

6          MR. KROCKMALNIC:  I suppose -- does it

7     amount to much from an actual monetary standpoint?  No.

8     But could I imagine why someone would feel wrong that

9     they're paying for someone to stay at a hotel and that

10    they're in fact not doing so for work purposes, but just

11    having a grand old time there, sure.

12         MR. CAMPBELL:  There's zero evidence of

13    that.  Yes, Mr. Snapper was asked, "Did you ever go to

14    the W with friends?  With a female?"  "Yeah, I may

15    have."  "Did you ever go up to your room with your

16    friends?"  "I may have if I'm out to dinner and then go

17    up and have a drink."  It was -- there's zero evidence

18    that's been disclosed about any of that.  It should be

19    excluded.  There should be no innuendo.

20         THE COURT:  Yes, I think it should be.

21    It's probative value is very low, it seems to me.  It's

22    prejudicial value is probably a little higher.  Um, and

23    it really is off the main drive here.

24         (Pause.)

25         THE COURT:  I'm not sure if what's at issue

1    with respect to this motion to exclude questioning about

2    other clients.  I guess I'm not exactly sure what that

3    controversy is.

4              MR. CAMPBELL:  Your Honor, I guess I'm not

5    exactly sure either.  You know, that Anchin, Block &

6    Anchin, has all different kinds of clients and a lot of

7    high-net-worth individuals, um, and that some of them

8    have actually showed up on an exhibit list, like

9    Christie Brinkley is on the plaintiffs' exhibit list.

10             So the plaintiffs' opposition to it -- the

11   plaintiffs' opposition to this motion, it sort of cites

12   other bad acts or other conduct that may or may not have

13   taken place with respect to those other clients and,

14   quote, "disclosing confidences" as they've outlined

15   in -- for other clients, you know, they have no tie-back

16   to this case at all.

17             The fact that my client represents other high-

18   net-worth individuals, other individuals whose name

19   might be recognized by the jury, is irrelevant to the

20   case, um, and it just -- it should be excluded.  There's

21   nothing that connects anything that they say to their

22   claims in this case.

23             And it's the classic stuff of confusion for the

24   jury, getting distracted on a side point about --

25   there's something in the opposition about somebody

1    taking -- wanting to sleep on the conference room

2    floor.  I just read the paper and that's what it says.

3    I don't know what that is, how it relates to the case

4    here, but it is -- it's way off the reservation.

5            MR. KROCKMALNIC:  Your Honor, I haven't had

6    the experience that Mr. Campbell has, I don't know what

7    this classic stuff is that he's referring to, but as I

8    say, we only intend to offer evidence of the existence,

9    and in rare cases the identity of Anchin clients, apart

10   from Ms. Cornwell and CEI and Dr. Gruber, only insofar

11   as it relates to the very specific allegations in this

12   case, and not for the sake of referring to them.

13       We note in our opposition that we have zero

14   intention of bringing up other complaints raised by

15   Anchin clients for some sort of character evidence

16   analog to say that "Other people are happy with them,

17   therefore you, jury, should find that we were improperly

18   -- or that we're properly unhappy with them, too."  None

19   of that.  It's only with what relates to the specific

20   allegations in this case.

21       And, your Honor, we submit there's plenty of

22   evidence that we intend to demonstrate at trial that

23   show that Anchin was not complying with, at a minimum,

24   again its fiduciary duties to CEI and to Ms. Cornwell

25   and to Dr. Gruber, by entering into conflict-of-interest

1   relationships between, on the one hand, plaintiffs, and,

2   on the other hand, Anchin clients, which is to say

3   Anchin was basically farming out some member services to

4   its own clients and where Anchin per se could not have

5   been acting in the best interests of both of them at the

6   same time.  We have some examples in our papers and I'm

7   happy to recite them for --

8                THE COURT:  They're win-win situations.

9                MR. KROCKMALNIC:  There are some win-win

10  situations.  It is -- and I use the term "per se

11  unadvisable," your Honor.  There are some win-win

12  situations and we're suggesting and again they're in our

13  papers that these were -- that at least some of them

14  were not win-win situations.

15               And separate and apart from this, with what

16  continues to relate specifically to this case, there is

17  evidence that we intend to introduce a charge that shows

18  that Anchin negligently -- and we should say "sloppily,"

19  we're not saying maliciously or otherwise, but

20  negligently commingled the files of Anchin -- I'm sorry,

21  of CEI and Ms. Cornwell with those of other clients.

22  When we got at the end of the business relationship with

23  Anchin, your Honor, it was around Labor Day weekend,

24  2009, Anchin produced multiple -- tens and tens of boxes

25  to us, and in those boxes there was supposed to be only

71

1    files relating to our clients, but there were files

2    relating to multiple Anchin clients that, um, had

3    nothing whatsoever to do with Anchin's -- with CEI's

4    files.  Conversely, or in parallel with that, there were

5    plenty of time entries on Anchin's monthly billing

6    statements that plaintiffs eventually saw -- and you'll

7    recall that plaintiffs didn't see them for a long, long

8    time, but plaintiffs eventually saw the monthly billing

9    statements and there were time entries, as you would see

10   in a law firm, billed to other clients or rather billed

11   to CEI for work done by other clients.  This is

12   absolutely relevant to the management -- to the

13   mismanagement here, to the heart of the business

14   management relationship, which again defendants don't

15   dispute.  And we don't seek to introduce names for smoke

16   and mirrors, um, or just for their own sake.

17          And lastly, your Honor, with respect to

18   Ms. Christie Brinkley, she is on our witness list, I

19   think -- actually it was an excusable Freudian slip,

20   she's not on our exhibit list, um, and we do not intend

21   to call her, Judge.

22               MR. CAMPBELL:  Better watch out with that,

23   Judge.

24               MR. KROCKMALNIC:  Sorry.

25               THE COURT:  Okay.  Well, on the

72

1    representation that the evidence goes to conflict of

2    interest, self-dealing kinds of things, I won't issue,

3    um -- the motion is denied.

4            Let's get to the campaign finance issue.

5                MR. CAMPBELL:  Um, thank you, your Honor.

6            This issue has not to do with, um, Evan

7    Snapper's issues with the Department of Justice and the

8    like, it has to do with, um, Evan Snapper's self-

9    reporting as he did and as the company did following the

10   lawsuit.  The United States government and the

11   Department of Justice did what it did, um, with respect

12   to Evan Snapper.  He pled guilty to the count that he

13   pled guilty to.  And we understand that that felony, um,

14   conviction by way of a plea, is going to be part of the

15   case.  That's not what we're talking about here.

16           As a result of him going to the government, to

17   the Department of Justice, um, the United States

18   government undertook an investigation for its own

19   purposes.  The suggestion in the case is that Anchin or

20   Mr. Snapper or both, um, somehow orchestrated what the

21   United States government did in response to

22   Mr. Snapper's going to the government and, um, self-

23   reporting or what occurred with respect to the Hillary

24   Clinton campaign and the Virginia campaign.

25           So the issue is, um, we didn't cause the

1    government to do anything in self-reporting, the

2    government then took that information and did an

3    investigation of other people.  In these papers for the

4    Department of Justice Ms. Cornwell states, um, that she

5    was -- she never received a target letter, apparently

6    she gave an interview.  Um, they describe issues of some

7    friends being -- um, friends of Ms. Cornwell and family

8    members being investigated by the FBI in connection with

9    this self-report.  It's not that Mr. Snapper or Anchin

10   caused that to happen, um, that's what the government

11   chose to do.

12          So to come in and suggest either overtly or to

13   suggest by way of innuendo or inference that Snapper and

14   Anchin did this for purposes of the lawsuit, to cause an

15   investigation of others, it's just -- it's unfounded.

16   It's just the government did what it did.

17          Secondly, um, the only person to be -- involved

18   with a guilty plea in the Department of Justice is

19   Mr. Snapper.  Anchin was cleared.  Ms. Cornwell, um, we

20   believe, wants to make the argument in the case that

21   because there was an investigation, because the United

22   States government followed up and did whatever it did

23   for its own reason, and no prosecution followed, no

24   indictment as to anyone, Ms. Cornwell or anyone else

25   followed, that that somehow relates to her innocence or

1   it relates to some issue in this case.  It doesn't.

2          The government prosecution, um, took place and

3   didn't take place for reasons that we'll never know, and

4   we don't know, and it would be speculation as to why the

5   government chose not to prosecute anybody as a result of

6   this investigation.  It could have been evidence issues,

7   it could have been funding issues, it could have been

8   lots of things, but it certainly shouldn't be that the

9   government believed Ms. Cornwell and didn't believe

10  Mr. Snapper, um, and that's the suggestion that we get

11  through the course of the case.

12          So that's the -- so that's what we're talking

13  about in this motion, there should be no, um, discussion

14  or evidence that the government investigated and sided

15  with Ms. Cornwell.  That's the crux of what we're

16  talking about.

17          This follows -- this motion has to do with

18  another motion that -- and I didn't know the extent to

19  which your Honor was going to take these up, but there

20  is one motion that we -- a couple that we wanted to make

21  sure that you address and that's the late-filing

22  witnesses, um, regarding -- in the case that the

23  plaintiff identified.  One was a Ropes & Gray partner

24  who was involved in Ms. Cornwell's issues and the second

25  is a Harvard, um -- someone from where Ms. Gruber works,

1    about the government's asking or instructions to save

2    e-mails.  It flows from this.  But that's an issue that

3    we need to discuss with your Honor.  But with respect to

4    the government motion, that's what we're talking about.

5                MR. WOLOSZ:  Thank you, your Honor.

6         First, a clarification.  This is not a

7    suggestion that the plaintiffs planned to make based on

8    the evidence, it's a claim, it's a claim in the case.

9    The claim that we had made is that Anchin is attempting

10   to, um, gain a tactical advantage in the litigation,

11   that it attempted to do so by self-reporting untrue

12   facts.

13        What happened is, in our initial complaint,

14   which was dated October, 2009, there was reference to a

15   $5,000 check that the plaintiffs had uncovered, and it

16   was a $5,000 check that was made out to "cash," but in a

17   memo line it referenced Mr. Snapper's daughter and a bat

18   mitzvah.  I don't have the exact terminology, but it had

19   that reference.  And the plaintiffs looked at this and

20   said, "Well, this doesn't make any sense.  We don't know

21   Mr. Snapper's daughter and we never authorized what

22   appears to be a $5,000 gift for her bat mitzvah.  So

23   that was in the initial complaint which was seeking, as

24   the Court probably knows, an accounting, among other

25   things, to try to get to the bottom of what was going on

1    with this.

2         We now know that apparently the inclusion of

3    reference to this check in the complaint prompted

4    Mr. Snapper to meet with management at Anchin to explain

5    what was going on with this $5,000 check and in the

6    process he disclosed to them, it appears to us, um, he

7    disclosed to them that this was actually a campaign

8    bundling scheme that extended beyond just that $5,000

9    check, involved a number of gifts that had been made by

10   other people and then reimbursed with Ms. Cornwell's

11   money.

12        Now, to be clear, our position is that

13   Ms. Cornwell did not know about anything improper that

14   was taking place, did not authorize anything improper to

15   be taking place, certainly did not mastermind this

16   campaign bundling scheme, but that's exactly what they

17   went and told the Department of Justice.  They reported

18   it as if Ms. Cornwell was behind the whole thing.  And

19   they kept it from us.  We had no idea that this had

20   taken place until all of a sudden, in January of 2010,

21   FBI agents showed up, pulled Ms. Cornwell's sister-in-

22   law out of a nail salon in Mississippi, burst into her

23   brother's construction company in Mississippi, barged

24   into the office of a friend and a construction

25   consultant in Massachusetts, and arrived unannounced at

1    the residence of a friend, a real estate broker in

2    Massachusetts.  She was never charged, she was never

3    told she was a target, but Mr. Snapper pled guilty as a

4    result of this investigation.

5            There are specific allegations in the complaint

6    that what they did here was they took information that

7    they had obtained as a fiduciary and they went and they

8    used it for improper purposes to gain a litigation

9    advantage to try to save themselves.  They threw her

10   under the bus, even though she wasn't the mastermind,

11   and that caused her enormous stress and it cost her lots

12   of money.

13           Now, their motion says that none of this should

14   be admissible, but let me come back to the first point I

15   made, this is not a suggestion, it's a claim.  We claim

16   breach of fiduciary duty, we could have listed each

17   breach as a separate count, we could have had 50 counts,

18   this would have been a count, it would have been a

19   standalone count for breach of fiduciary duty.  The idea

20   that they can gut the whole count by saying, "Well, the

21   evidence in support of that count is too prejudicial,"

22   makes no sense.  It's like defending against a breach of

23   contract claim by saying there should be no evidence of

24   a contractual relationship because it's prejudicial.

25   I mean, that's not what the rule is for.

1          So there is no justification whatsoever for not

2     mentioning the investigation at all.  It has to come in

3     in connection with this claim.  It also has to come in

4     because, as counsel pointed out, Mr. Snapper's guilty

5     plea comes in and it's related to that.

6          The only question, I think, that remains is

7     that they step away from that argument and they say,

8     "Well, in addition, you can't draw this inference that

9     she's innocent because she wasn't charged."  Well, the

10    investigation took place, they tried to say she did it,

11    and nothing came it, but he pled guilty.  Those are fair

12    facts for the jury to consider in connection with this

13    breach-of-fiduciary-duty claim.

14          Now, agreed, there can be other reasons why,

15    you know, the grand jury may not have decided in any

16    particular case to go after somebody, and so if the

17    defendants want to suggest a jury instruction, um, that

18    would, you know -- that would instruct the jury as to

19    what they can properly and cannot properly infer, we can

20    take that up at the appropriate time.  But the idea that

21    it shouldn't be permitted makes no sense because, as I

22    said, the claim is based on the investigation, so the

23    investigation has to be discussed.  Once we discuss the

24    investigation and we discuss that he pled guilty, we

25    can't just leave it hanging out there what happened with

1   respect to Ms. Cornwell, the jury will start filling it

2   in in their own minds.  Maybe the investigation is still

3   ongoing.  Maybe it's not.  Maybe she pled guilty, too.

4   Well, she didn't.  And so it's crucial for us to be able

5   to explain that piece of the puzzle as well so that they

6   understand what happened and so that they understand

7   this claim.

8               THE COURT:  Okay.  I think the subject

9   matter is probably admissible as part of a breach-of-

10  fiduciary-duty theory, but exactly the dimensions of

11  what gets into evidence, um, we may have to wait and see

12  how it's offered and what the stage of the proceedings

13  are at that time.

14              I will say that I think the plaintiffs are

15  playing with fire a little bit here, but that's up to

16  them, I guess.  It's just an observation.  But I think

17  the topic does fit with the theory of breach of

18  fiduciary duty.

19              So I guess as an in-limine matter, that motion

20  is excluded at this time, without prejudice to trial.

21              MR. CAMPBELL:  Understood, your Honor.

22              Given the importance of the issue and really

23  the -- I understand your Honor's ruling with respect to

24  the subject matter.  It's really, um -- and I had a

25  discussion with someone -- um, with Ms. Lukey, um, and

80

1    I've heard it said, um, that no one's believed Snapper

2    yet, and so that's the kind of suggestion that has no

3    place in this case, you know, not the least of which is

4    the two different standards that --

5              THE COURT:  No, I agree with that, but you

6    can't ask the jury to disbelieve it because somebody

7    else may have disbelieved it.

8              MR. CAMPBELL:  And if -- you know, as you

9    extrapolate off the fact of the investigation and what

10   can be and cannot be properly withdrawn from that, I

11   would suggest and ask your Honor that some form of limit

12   be placed on what we're doing with this at least insofar

13   as the opening goes and to see how the evidence comes

14   in.  Because once this kind of stuff is said in the

15   opening, um, then everybody's in a position to having to

16   react and deal with it.

17             THE COURT:  Well, one of the difficulties

18   is that you have very different views as to what the

19   facts are, um, and each side is entitled to present

20   their version of the facts and it's up to the jury then

21   to decide that.  I mean, their version is, I gather,

22   from what I've heard, that this was all Mr. Snapper's

23   concoction from the beginning, they had nothing to do

24   with it, so on and so forth, but yours is quite

25   different, and that's not unusual in jury trials.

1          MR. CAMPBELL:  Yes, your Honor.  Thank you,

2    your Honor.  I understand your Honor's ruling and again

3    it's the extrapolation to the point of because she was

4    in charge, that means she -- that they're right.  You

5    know, that's our point.

6          (Pause.)

7          THE COURT:  Um, there really are only two

8    more that I want to -- I think we need to address in

9    argument and that is, um, Mr. Manisero's testimony.  And

10   let me just, um -- well, go ahead.  The motion is yours.

11         MR. CAMPBELL:  Um, we think, your Honor,

12   that it should be excluded for the reasons that we set

13   forth in our briefing.  Um, the statement that is, um,

14   attributed to Mr. Manisero is not defamatory.  It should

15   be eliminated from the case.  He shouldn't --

16         THE COURT:  Well, we had a motion for

17   summary judgment on this and I denied it basically

18   because we have to hear what the evidence comes out as,

19   I guess.  This is about how the evidence might come out.

20         MR. CAMPBELL:  Correct.

21         THE COURT:  Does Mr. Manisero have to get

22   on the stand to say, yes, it was he who talked to the

23   reporter and said that, or deny that?  And I don't know

24   which way the testimony will go.  Um, and I don't know

25   whether this would be a question of if he did say what

1    was alleged to have been said, um, he was acting as an

2    agent, so it was attributable to Anchin?  Those are the

3    evidentiary questions.  A separate question is, is any

4    of that enough to prove their claim for defamation?

5                    MR. CAMPBELL:  That's right.

6                    THE COURT:  Again, it's -- whether there

7    can be an absolute ruling at the -- at this, literally,

8    preliminary stage of the case.

9                    MR. CAMPBELL:  Well, what we have to say

10   about the issue, your Honor, is set forth in the

11   papers.  We don't think it's defamatory.  We don't think

12   it's actionable.  The statement itself I don't believe

13   there's going to be any more evidence about anything

14   other than what is reported in that newspaper.  So

15   that's the evidence.  And I understand your Honor's

16   observations about how it might come down.

17               So I'm understanding that you're going to

18   either deny --

19                    THE COURT:  Well, I think the evidence is

20   -- the practical suggestion would be that there's kind

21   of two very limited facts that I guess Mr. Manisero

22   would be called for, one is what was said to the

23   reporter and whether that was consistent with what the

24   reporter wrote, and I guess something about the scope of

25   an agency relationship in speaking to the press about

1    such matters so that the statement could be attributed

2    to the defendants.  I mean, it's not Mr. Manisero who's

3    accused of defamation, it's the defendants.

4                   MR. CAMPBELL:  Correct.

5                   THE COURT:  There's some suggestion that

6    there was some proposal that those matters be addressed

7    by stipulation, um, simply to avoid the prospect of a

8    trial lawyer being called as a witness, um, that would

9    be -- from my point of view that would be desirable if

10   you could come to a stipulation on those matters and let

11   the jury decide -- if it gets to the jury, whether

12   that's defamatory.  I don't know.

13         So I'm going to leave this one unresolved and

14   see if you can maybe explore that further among

15   yourselves.

16                   MR. CAMPBELL:  Thank you, your Honor.

17                   THE COURT:  All right.  Finally there's the

18   plaintiffs' motion, which is a sealed motion, um, about

19   a number of matters, and it strikes me that they're

20   largely irrelevant and should be excluded.  So we'll

21   hear from them.

22                   (Pause.)

23                   THE COURT:  The best argument of the day.

24                   (Laughter.)

25                   MR. CAMPBELL:  Did he say nothing?

1            THE COURT:  I invited him to say nothing.

2            MR. CAMPBELL:  Okay.

3        Your Honor, we agree as to some of this.

4    There's five issues in the motion, as we understand it.

5            Um, the inspiring copy-cat crimes, we agree

6    with that, I think it's -- we have it as Number 3.  Um,

7    their source of inspiration for Ms. Cornwell, of course,

8    we don't intend to discuss that issue insofar as it --

9    whatever that inspiration may be, but as a tag-along to

10   that there was reference that Ms. Cornwell lost access

11   to sources and the FBI and other things like that.  We

12   don't agree to that as being factual and we believe

13   that's a fact at issue in the case and the evidence will

14   be disputed.  So we would oppose that aspect of it.

15           The issue of this Leslie Sacks, who is a person

16   that was stalking Ms. Cornwell, um, we don't intend to

17   adopt or involve anything that Mr. Sacks had to say and

18   the like.  However, it may have a bearing on a couple of

19   facts in the case and issues in the case that may come

20   up.  For instance, um, with respect to missed book deals

21   or late things like that, there were -- this type of

22   thing was going on for Ms. Cornwell and it may have had

23   an effect on, you know, where her attention was or what

24   she was dealing with or other things going on, and I

25   would suggest that before I would ever do anything in

1    that regard, I would approach your Honor, and that's how

2    I would see that kind of thing coming in.  Not to say

3    whatever Mr. Sacks says is true or to imply that at all,

4    just that she had to deal with something else along the

5    way.

6            The issue with respect to the FBI agent's wife

7    and the like, um, that may again be relevant to the

8    extent that the case turns or goes towards issues of

9    access to the FBI, and if things want to be blamed on,

10   um, you know, the government investigation -- the DOJ

11   investigation, um, then it may be that perhaps this

12   would have a bearing on it.  And once again, your Honor,

13   I wouldn't blurt something like this out, I would

14   approach your Honor and explain my thinking as the basis

15   for admissibility before I would do to.

16           THE COURT:  Well, I think that may be the

17   way to deal with the whole motion.  In other words, for

18   the subject matters identified in the motion, they're

19   out unless we specifically address it at the time and

20   allow them in.

21           MR. CAMPBELL:  Okay, that's fine, your

22   Honor.

23           THE COURT:  So --

24           MR. CAMPBELL:  There's an issue on this one

25   with respect to the --

1            THE COURT:  Well, let me just finish,

2    because I do appreciate your comment that sometimes the

3    way evidence comes in makes something seem more

4    important at trial than it might seem in advance of

5    trial.

6            MR. CAMPBELL:  Okay.  With respect to the

7    motion to seal this, um, the motion in limine, I don't

8    know that your Honor has ever ruled on that, I just want

9    to make sure that I -- if it's under seal and in a

10   public courtroom, and we just talked about it, and I

11   don't know if your Honor has ruled on it, and I just

12   want to understand what the scope of whatever can be

13   done with this motion is.

14           MR. WOLOSZ:  If I may, your Honor?

15        We have asked that the motion be under seal.

16   We're not requesting that this discussion be somehow

17   included.

18           THE COURT:  Yeah.  Okay.  Well, if it

19   hasn't been -- it's kind of routine, and they're treated

20   as sealed until there's a denial of the motion.  So the

21   motion is granted and we can discuss how to deal with

22   any matter such as that at trial, if it's necessary.

23   There will of course be a jury that will be included

24   within the seal.

25           I think that's it unless -- and the rest I

87

1    think we can deal with on paper, unless there's

2    something in particular?

3                    MR. CAMPBELL:  There's a couple of things

4    that if your Honor has the time, I'd like to address,

5    the first and foremost is this issue of the late-

6    disclosed witnesses.

7              There was a group of three witnesses, including

8    Mr. Manisero, um, I think four at the time, but one has

9    been withdrawn.  And let me be specific.

10                   (Pause.)

11                   MR. CAMPBELL:  Um, in addition to

12   Mr. Manisero, in early August, some three weeks before

13   the start of the first trial, um, a Steven Braga, from

14   Ropes & Gray, a partner, apparently he left in September

15   or something, and Peter Pakevich, who's from Harvard, is

16   apparently going to testify regarding a collection of

17   Dr. Gruber's e-mails.

18             We believe that they shouldn't be allowed to

19   testify for reasons that we state in the brief.  And I

20   should say there was another one, Marcella Fierro, and

21   she's a medical examiner from Virginia.

22             We understand that there's no intention to call

23   both witnesses?

24                   MR. KROCKMALNIC:  That's correct.

25                   MR. CAMPBELL:  Okay.  So with respect to

1    Mr. Braga, who's going to talk about the government

2    investigation, I guess, it's late disclosed, we think

3    it's irrelevant, and it shouldn't be admitted for that

4    reason, but also it wasn't revealed to us until just

5    prior to the first trial, as was Mr. Pakevich, and the

6    same argument would pertain there.  To the extent your

7    Honor is going to let them testify, we request that we

8    be given an opportunity to depose them.  And, in fact,

9    we were given that opportunity, we deferred on that

10   opportunity, hoping -- in the event that your Honor

11   would get to these motions and these issues, um, before

12   today.  I mean, if they're going to be excluded, we

13   didn't want to waste anyone's time deposing them.  But

14   given that we're approaching trial, we asked -- and I

15   don't know who on our team asked, but we were asked for

16   the deposition sometime, I believe, either in late

17   October or something.  We asked for it a while ago.  And

18   the response was, "You can have the deposition, but you

19   have to drop your objection to that," and we refused to

20   do that so -- because we believe that objection was well

21   founded, and to the extent your Honor rules one way or

22   the other, that's what we're asking for.  But at a

23   minimum, for witnesses that were just disclosed three

24   weeks before the prior trial, we should absolutely get a

25   deposition of them.

1          MR. KROCKMALNIC:  Your Honor, if I may be

2     heard on that briefly?  Just to correct the

3     representation made by Mr. Campbell there.

4          We offered to facilitate the depositions.  We

5     didn't just assent to the depositions of Mr. Braga and

6     Mr. Pakevich, we offered to facilitate with counsel for

7     defendants for the taking of those depositions.  The

8     only thing we said was, "You can't have your cake and

9     eat it, too.  You can't both take their deposition and

10    claim that our disclosure of them as witnesses is

11    untimely."

12         So Mr. Campbell is incorrect in suggesting to

13    the Court that we made the witnesses conditionally

14    available on the condition that defendants drop all of

15    their objections to the witnesses.  We said specifically

16    that you must drop the timeliness objections to the

17    witnesses.

18         These are set forth in a correspondence on

19    November 8th, November 12th, and again on November 12th

20    as between substantially everyone in this courtroom and,

21    of course, Ms. Lukey as well.  I'm happy to read to you

22    the substance of the correspondence.  I'm sure you would

23    take my representation that it relates only to the

24    timeliness of the objection.  We think it is amply fair

25    for them to take their deposition.  We offered to do

1    so.  But you can't then take the depositions and say,

2    "You know what?  You guys gave it to us too late, so

3    we're unduly prejudiced."

4            And, by the way, we offered, in the first

5    instance -- we supplemented our disclosures to include

6    them on the witness list on July 23rd, I believe is the

7    date.  The trial was set for January 7th.  Five and a

8    half months is more than enough is our position on

9    that.  Your Honor, if you want to hear our position on

10   the actual relevance of the witnesses, I'm happy to

11   speak with regard to that, as the Courts likes.

12           THE COURT:  I'll take this one on the

13   papers.

14           Okay.  So as to all the others, I'll reserve

15   that one, and all the others that we haven't addressed,

16   and we'll notify you very shortly about those.

17           I think we should have -- the trial is

18   scheduled for Monday, January 7th.  I think we should

19   have a final pretrial conference the previous Thursday,

20   which is the 3rd, and it's complicated by the holidays,

21   but I think that's the most sensible time.  Usually I

22   like to have it a little farther away from the trial,

23   but it makes it difficult on the calendar.

24           Is Ms. Lukey available?

25           MR. WOLOSZ:  She's not, unfortunately.

1      THE COURT:  Is she going to try the case?

2      MR. WOLOSZ:  She is, yes.

3      Is there any flexibility as to Thursday the

4  3rd?

5      Can I have one second?

6      (Pause.)

7      MR. WOLOSZ:  Is the 4th an option?

8      MR. CAMPBELL:  We'll be available, Judge.

9      THE COURT:  Okay, the 4th is okay.  It's

10  last-minute scheduling, but that's all right.  We can do

11  that.

12      So why don't we say 10:00 on the 4th of January

13  for a final pretrial.  We can discuss the matter.

14      Let me tell you a couple of things that I am

15  tending to think, but we won't resolve fully, so you can

16  think about them and so on.

17      I'm inclined to think that time limits are

18  appropriate for this case and that, um -- I think I've

19  had estimates before about how long people think this is

20  going to take.  I've had in my head somewhere in the

21  four week, perhaps a little bit more, time period.  So

22  I'm thinking that 30 hours per side would be

23  appropriate.  Um, I don't ask for an answer right now,

24  but that's something we could discuss at the pretrial.

25      I'm also thinking of the burden that may impose

1   on jurors to be here for a number of weeks and that it

2   might be -- even though it's a trade-off, that it might

3   be helpful for the jurors if we sat only four days a

4   week rather than five.  We're on 9:00 till 1:00, so

5   jurors will have the afternoons, um, and -- but I just

6   thought if they could have a full day off once a week,

7   that will be helpful, too.  So those are some ideas I

8   have and you can think about those.

9           Was there anything else?  Okay.  So, yeah.

10              MR. CAMPBELL:  Your Honor, I just made a

11   list of some things that I wanted to inquire of you.

12           In terms of the opening, you probably just

13   answered the question, but in terms of the time limit on

14   the opening, um, I was just wondering about that, and

15   the use of a Power Point and other materials.

16              THE COURT:  I haven't done time limits very

17   much, um, but when I have I believe -- this is from

18   memory, but that I've excluded openings and closings

19   from it, that it's an evidence limit.  And, by the way,

20   it's a strict limit.  The last time I did it somebody

21   ran up against the time and asked for more time and I

22   denied it on the theory that limits ought to limit.  But

23   I'm the sole timekeeper, me and my staff, you know, the

24   judge's decision is final, as they say, and, um --

25           What's the other part of the question?

93

1            MR. CAMPBELL:  Um, the use of materials in

2    the opening.

3            THE COURT:  Fine, as long as you show it to

4    the other side and if there's an issue, we'll deal with

5    it in advance.

6        I assume you've all used some of our equipment

7    here.  Um, here's something you should do before -- if

8    you haven't done it already, before that Friday, which

9    is way too late to do it, and that is to get the

10    exhibits in a form that they can be loaded into our

11    electronic jury evidence system.

12            MR. CAMPBELL:  I believe that we're seeking

13    to do that either by this Friday or Monday.

14            THE COURT:  Okay, good.  That's fine.  You

15    have to deal with our IT people, there are some rules

16    about the kinds of files that can be uploaded, the size

17    of files that can be uploaded, um, and so on.  So talk

18    with the IT people about that.

19            MR. CAMPBELL:  Your Honor, the jury

20    selection process in this case may, as you already

21    mentioned, may be difficult for the timing of it, um,

22    but I also believe that given the identity of the

23    parties, um, and information that's available on the

24    internet, as you know, um, that we need to address that

25    in some way and I want to raise it with you in terms of

94

1    preventing other internet disclosures and in

2    publications that way, um, so that it may get to the

3    jury and influence them.  I believe we need a very

4    strong, um, caution from the Court about accessing the

5    internet and the like.

6              THE COURT:  We do that as a matter of

7    routine.  I'm pretty confident that our jurors follow

8    that.  I know this has been reported in the paper in the

9    last couple of days, a breach of that, and it can

10   happen.  Um, but even in that case where it was reported

11   -- you'll note that everybody else on the jury reported

12   it to the judge.

13             MR. CAMPBELL:  That's right.

14             THE COURT:  So I think, um, you know, my

15   sense is that jurors take their responsibilities very

16   seriously and they really try to adhere to our

17   instructions.

18             MR. CAMPBELL:  Thank you, your Honor.

19        In terms of the jury selection process, um,

20   would your Honor consider -- is it just going to be sort

21   of the regular, bring them all in, bring them up, um, no

22   questionnaires or anything like that?

23             THE COURT:  My practice is to do 12-person

24   juries in civil cases.  The rule permits anything

25   between 6 and 12.  Um, I gave some thought to -- and the

95

1    reason for that is I think that larger juries make

2    better decisions, um, by and large.  If that's the case,

3    then each side would have three peremptories.

4            So in picking a jury, we would need 18-cause-

5    free jurors.  Because we have the flexibility under the

6    rule, if for some reason we have trouble getting 12, we

7    can go with 11 or 10 or whatever we can get.

8            MR. CAMPBELL:  Assuming that we have 18

9    from which we would then strike to them, with regard to

10   the 12, how would we exercise the peremptories, the

11   plaintiff?  The defendant?

12           THE COURT:  Um, yeah, we typically proceed

13   in rounds, um, but it doesn't take many rounds to use up

14   your three.  So in the first round, the plaintiff would

15   go first, followed by the defendant, for anybody in the

16   box, and they get 12 in the box.  The plaintiff

17   challenges one, the defendant challenges two, those

18   three are excused, they're replaced, and those three are

19   eligible to challenge, and the other nine that have been

20   passed are not.

21           The second round, the defense would go first,

22   followed by the plaintiff, and we would keep doing that

23   until it's done.

24           MR. CAMPBELL:  Okay.  There's a lot of --

25   an immense amount of deposition testimony in the case

96

1    and many of those witnesses, the fact witnesses are out

2    of state.  We've exchanged deposition designations, your

3    Honor, but we have not met to go over -- to meet to

4    review all objections to come up with what would be

5    read.  When would you like that done?

6              THE COURT:  Well, enough in advance of that

7    witness's testimony that I can go through it.  What I've

8    done in the past is taken the transcript, marked up by

9    the parties to show what evidence is offered and what

10   objections are made, um, just maybe write in the margins

11   saying, you know, "Lines 3 through 17 are objected to as

12   hearsay," and I'll just read through it and make the

13   rulings.  If it's done enough in advance, you can then

14   take those rulings into account and produce a clean

15   transcript, as it were, that could just be --

16             And, I don't know, are any of these video

17   depositions?

18             MR. CAMPBELL:  I believe that at least one

19   is.

20             THE COURT:  Particularly with respect to

21   videos, they could be edited to be smooth, otherwise if

22   they're going to be read on the stand or whatever, um,

23   you'll be able to do that.

24             So -- it's not a hard-and-fast rule, and it

25   will depend on when a witness is going to be called, but

97

1    I don't want a stack of depositions that I have to read

2    with two days notice.

3              MR. CAMPBELL:  Your Honor, in terms of

4    questioning of witnesses on objections, the

5    understanding is that you would like the lawyers at the

6    podium?

7              THE COURT:  At the podium, yes.

8              MR. CAMPBELL:  What about with respect to

9    objections, the word "objection," "objection hearsay,"

10   anything more than that or how does that work?

11             THE COURT:  Typically an objection is

12   enough.  I'll get the drift.  If I don't, I'll ask you.

13             MR. CAMPBELL:  Okay.

14        And then we've met and conferred on exhibits.

15   There's a whole bunch of exhibits that are unobjected to

16   and there's some that obviously have objections.  Are we

17   going to just take those up as we offer them?

18             THE COURT:  I think so.  I think that's

19   usually the easiest way.  Among other things, I mean,

20   that way I can understand it in context, both the

21   proffer and the objection.

22             MR. CAMPBELL:  Finally, your Honor, there's

23   a serious choice-of-law issue in the case with respect

24   to Massachusetts law versus New York law, um, and

25   particularly in preparing for some things, um --

98

1          THE COURT:  How much difference is there?

2          MR. CAMPBELL:  I believe that it's

3    substantial at least in some areas, for instance, the

4    law regarding fiduciary duty is --

5          THE COURT:  Who's on which side?  Are you

6    on the New York side or the Massachusetts side?

7          MR. CAMPBELL:  To be honest, Judge, I don't

8    even know.  But I do know -- and I think it kind of

9    switches back and forth in terms of what law might be

10   more favorable to one side or the other on any given

11   issue.  I know that issues may be different in the

12   choice, but just as a matter of advising the Court,

13   there is a choice-of-law issue in the case.

14         MR. WOLOSZ:  I'm just trying to understand

15   from my colleagues what the precise status of the issue

16   is.  As I understand it, um, our position is -- and we

17   may be largely in agreement on this, is that New York

18   law applies with respect to everything, the exception

19   being Chapter 93A, which of course would be

20   Massachusetts law.

21         MR. CAMPBELL:  Your Honor, I don't think

22   that's accurate with respect to everything.  I just

23   don't --

24         THE COURT:  Well, maybe the way to do it is

25   to address it in a pretrial brief or a trial memo of

99

1    some kind.

2                 MR. CAMPBELL:  Your Honor, I believe it is

3    actually addressed in the substantial pretrial memos.

4                 THE COURT:  Oh, it is.  Okay.  Then we'll

5    take a look at it.

6                 MR. CAMPBELL:  Thank you, your Honor.

7                 THE COURT:  Okay.  The Court in recess.

8                 (Ends, 4:30 p.m.)

9

10                 C E R T I F I C A T E

11

12                 I, RICHARD H. ROMANOW, OFFICIAL COURT

13   REPORTER, do hereby certify that the foregoing record is

14   a true and accurate transcription of my stenographic

15   notes, before Judge George A. O'Toole, Jr., on

16   Wednesday, December 12, 2012, to the best of my skill

17   and ability.

18

19

20   /s/ Richard H. Romanow 02-12-13
     _____
21   RICHARD H. ROMANOW  Date

22

23

24

25